# United States Court of Appeals
## For the First Circuit

No. 09-1322

UNITED STATES OF AMERICA,

Appellee,

v.

WINSTON MCGHEE, a/k/a Pooh,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Howard, Circuit Judges.

J. Martin Richey, Federal Defender Office, for appellant.
Nina Goodman, Appellate Section, Criminal Division, Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, and Carmen Milagros Ortiz, United States Attorney, were on brief for appellee.

December 7, 2010

**BOUDIN**, <u>Circuit Judge</u>.  A jury found Winston McGhee guilty of possession of cocaine base (at least five grams), 21 U.S.C. § 844(a) (2006), and of possession of cocaine base with intent to distribute (less than five grams), <u>id.</u> § 841(a)(1).[1]  He now appeals on three grounds:  that the search of his person violated the Fourth Amendment; that the court impermissibly allowed a testifying chemist to rely in part on another chemist's test results as to one drug sample (the sale of which was not charged); and that at sentencing, a youthful offender adjudication was improperly treated as a career offender predicate.

During June and July 2006, Jeffrey Stone (a sergeant in the Massachusetts State Police) and Nicholas Curelli (a detective in the Oak Bluffs, Massachusetts, Police Department) investigated reports of cocaine sales by Jordan Clements, her boyfriend Calvin, and his friend called "Pooh."  On July 10, a confidential informant made a controlled purchase of a sample from Pooh, which Stone observed before following Pooh back to the Nashua House hotel.  The sample was contained in a corner of a plastic bag that had been twisted and cut off from the original bag.  The officers concluded from appearance and a field test that the sample was crack cocaine,

---

[1]After McGhee's trial and sentence, both § 841 and § 844 were amended by the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, which increased from five grams to twenty-eight grams the amount of cocaine base distribution triggering the statutory sentencing range of five to forty years and which removed a five-to-twenty-year range for possession of more than five grams of cocaine base.  <u>Id.</u> §§ 2(a)(2), 3, 124 Stat. at 2372.

and a Nashua House employee informed Curelli that Clements and two men were staying in Room 6 of the hotel.

Based on this evidence, the officers obtained a warrant permitting them to search for cocaine and records, money, or paraphernalia related to illegal drug possession in Room 6 and on the person or in the possession of Clements, Calvin, and Pooh. That evening, the officers stopped McGhee as he entered the hotel--he denied using the name Pooh and identified himself as Winston McGhee--and in a pat down took from him a knife. McGhee walked up to Room 6 with the officers, and Curelli began to search him while Stone searched the room.

There, the officers found fifteen corners and seventeen knotted ends of plastic sandwich bags, a cell phone, and two receipts--one for the room registration in Clements' name and one dated that day for a bicycle in McGhee's name; they found no cocaine and no apparatus for smoking crack. In McGhee's pockets and wallet, Curelli found identification with McGhee's name and $1,229 in cash--although McGhee was unemployed at the time--and another cell phone that displayed the name "Pooh." The officer found marijuana in McGhee's shoes and arrested him.

Around this time, two more male officers--McSweeney and Marquis--joined Stone and Curelli in the room. Curelli had McGhee remove his polo shirt and blue jean shorts, leaving him in his underwear (an A-shirt and basketball shorts) and revealing a brand

or scar of "Pooh" on his arm.  Stone then instructed Curelli to complete his search.

McGhee began to protest, saying that they could not search him or "stick a finger up [his] ass."  Stone replied that they would not do that, but they would "do a complete search." McGhee refused and then physically resisted removal of his underwear; against resistance, the officers forced McGhee to the floor, pulled down his shorts, and found a bag protruding from between McGhee's buttocks, which McSweeney picked up.  The bag contained thirty-one individual baggies of what, when later tested, proved to be cocaine base.

McGhee was indicted for possession of cocaine base and possession with intent to distribute cocaine base; the grand jury alleged in both counts that the offense involved at least five grams of a substance containing a detectable amount of cocaine base.  Prior to trial, McGhee moved to suppress the seized evidence but his motion was denied.  At his trial the officers testified to the events set forth above including the original sample purchased by the informant, the searches of the room and of McGhee and the evidence obtained in both searches.  There was also expert testimony from a chemist that the drugs in the baggies were cocaine base and totaled 7.88 grams and that the sample was also cocaine base and weighed 0.49 grams.

The jury found McGhee guilty of both counts; in answers to special interrogatories, the jury stated that the substance in both counts was cocaine base, but that the five-gram minimum was only shown for the possession count. The separate inquiry was pertinent because, among other things, the five-gram figure affected the statutory sentencing range then in force. 21 U.S.C. §§ 841(b)(1)(B)(iii), 844(a). At sentencing, the district court ruled over objection that McGhee qualified as a career offender, U.S.S.G. § 4B1.1 (2008), leading to a guideline range of 210 to 262 months' imprisonment, but the district court granted a downward variance and sentenced McGhee to 96 months' imprisonment. McGhee now appeals.

We begin with McGhee's claim that the district court should have suppressed the package of thirty-one baggies. Police searches are constrained by the Fourth Amendment's reasonableness requirement and, in certain circumstances, by the further requirement of a warrant. E.g., Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009); 1 W. LaFave, Search and Seizure § 1.1(a), at 8 (4th ed. 2004). McGhee does not argue that a warrant was needed if the requisite grounds existed for so intrusive a search incident to an arrest. Conversely the government chose not to assert that the warrant separately authorized a search that included removal of

McGhee's clothes,[2] but defends the search as reasonable incident to the arrest.

McGhee had been validly arrested on a drug offense at the time of the search and, although McGhee was formally arrested only for marijuana possession, there was probable cause to believe that he was a drug trafficker since he had sold a drug sample earlier in the day. In an ordinary arrest, a "full search of the person" is a conventional means of protecting the arresting officers from weapons and assuring against the destruction of evidence. United States v. Robinson, 414 U.S. 218, 235 (1973); see also Chimel v. California, 395 U.S. 752, 762-63 (1969).

But, as a search extends beyond a pat down and the removal of outer garments, shoes and socks, the case law has required increasing justification for more intrusive measures, see, e.g., Swain, 117 F.3d at 5-6; our decisions, although sometimes varying in labels, tend to distinguish between (1) a simple strip search involving removal of all or virtually all clothes, (2) a visual inspection of genitals or buttocks requiring some change in posture of the body (for example, the subject might be forced to

---

[2]The warrant authorized a search for cocaine and related evidence on the person or in the possession of Pooh, and it incorporated an affidavit stating "that people who use, possess and sell drugs will often conceal drugs on their body." Cf. Doe v. Groody, 361 F.3d 232, 239-40 (3d Cir.), cert. denied, 543 U.S. 873 (2004); United States v. Husband, 226 F.3d 626, 638-39 (7th Cir. 2000) (Easterbrook, J., dissenting); United States v. Nelson, 36 F.3d 758, 760 (8th Cir. 1994).

-6-

bend over and spread his buttock cheeks), and (3) an actual manual intrusion into such orifices.  E.g., Blackburn v. Snow, 771 F.2d 556, 561 n.3 (1st Cir. 1985); see also United States v. Barnes, 506 F.3d 58, 62 (1st Cir. 2007).[3]

In this case, the district court found that McGhee was subject on arrest only to the first of these three additional measures, using the term "strip search" to exclude the more intrusive visual body cavity search.  McGhee rather briefly asserts that in fact what occurred here was a visual body cavity search. The district court may be entitled to different measures of deference depending upon whether the focus is upon characterization of evidence or its findings of raw facts, compare Ornelas v. United States, 517 U.S. 690, 699 (1996), with United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010), but regardless, the record evidence confirms the district court's conclusion.

Thus, McGhee argues that while a strip search involves a view of the naked body in a natural posture, the district court found that the officers had held McGhee down and pulled his ankles apart, revealing "what was hidden in between the cheeks of his buttocks."  But the description is incomplete and the word "hidden"

---

[3]Further, a search on arrest may be assessed differently than searches in other circumstances.  McGhee's situation thus differs from a search of pretrial detainees, for which security interests of detention facilities may add justification, see Bell v. Wolfish, 441 U.S. 520, 559-60 (1979), or a search conducted long enough after arrest that the exigent threat of destruction of evidence has faded, see Swain v. Spinney, 117 F.3d 1, 8-9 (1st Cir. 1997).

is inaccurate. The record shows that, far from submitting to the request to strip, McGhee deliberately swung his body into the officers, and the district court found that he made a non-forcible strip search impossible "by clenching his buttocks, by tangling his ankles, by refusing to get up, by resisting in a variety of different ways."

The officers, as the district court ruled, did "no more than was necessary to obtain a full strip search"; the "spreading" of McGhee's legs was only "in the sense that [an officer] untangled [McGhee's deliberately entangled] ankles" and, at that point, the officers "observed . . . in plain view, protruding from Mr. McGhee's buttocks," the package containing the thirty-one baggies of cocaine. In fact, the back of McGhee's undershorts were pulled down only enough to expose his buttocks, so the legs, being bound by the garment, probably could not readily have been pulled far apart into some unnatural posture.

The question remains whether the officers had whatever enhanced grounds may be needed to justify any strip search at all. Here, the government cites our statement in Barnes that "[t]he initial strip search [of the defendant] for contraband and weapons was clearly justified given Barnes's arrest for a drug trafficking crime," 506 F.3d at 62; Barnes then went on to assess a more intrusive body cavity inspection (a bend-over-and-spread-your-cheeks direction) based on a tip that the defendant regularly

concealed drugs between his buttocks, id. at 60-65. The quoted statement in Barnes, says the government, lays down a general rule that justifies a strip search of any drug-trafficking arrestee.

McGhee responds that categorical rules are always to be rejected in the Fourth Amendment context and that everything must turn on evaluating the specific facts. Yet generalizations lie behind every such evaluation, Tardiff v. Knox Cnty., 365 F.3d 1, 5 n.6 (1st Cir. 2004): the question is whether a generalization is powerful enough to become a rule of thumb or something stronger. Over-generalization risks error; the absence of rules invites endless reinvention and inconsistent outcomes. There are plenty of rules and rules of thumb in the Fourth Amendment cases,[4] whether Barnes were read as a rule, a presumption or something less.

However, McGhee says that the quoted language in Barnes is only a dictum because, in the end, that decision focused on a more intrusive body cavity search and upheld it in light of the particular facts in that case including the tip as to the defendant's own past practice. But whether the statement was pure dictum or played a role in the decision's reasoning, the Barnes court fairly viewed drug trafficking as linked to concealment of

---

[4]See, e.g., Samson v. California, 547 U.S. 843, 857 (2006) (statutory suspicionless searches of parolees); United States v. Villamonte-Marquez, 462 U.S. 579, 580-81, 592-93 (1983) (suspicionless boarding of vessels for inspection of documents); Henry v. United States, 361 U.S. 98, 100 (1959) (warrantless arrest for felonies committed in officer's presence).

drugs; and <u>Barnes</u> made clear, in what is more than dictum, that an intrusive search of a validly arrested person (whether a strip search or a visual body cavity search) requires only a reasonable basis for supposing that the particular kind of search employed might be fruitful.  506 F.3d at 62-63.

Here, it is enough that the officers had ample reason to suspect that McGhee might well be concealing drugs about his person and not just in his pockets.  Marijuana had already been found concealed in his shoes; and, when one officer told him without being more specific that the team was about to complete the search, McGhee began to protest, saying that they could not "stick a finger up [his] ass."  Although reassured that this was not going to occur, McGhee physically resisted removing his shorts; his pattern of behavior was a reasonable signal that drugs were likely concealed within.  On its own facts, the search was lawful and suppression properly denied.

McGhee's second claim concerns the testimony given at trial to establish the nature and weight of the drugs.  Caroline Tatro, a chemist at the Massachusetts State Police Crime Laboratory who had analyzed the thirty-one baggies, testified that they contained 7.88 grams of cocaine base.  It was these baggies that were the subjects of both counts of the indictment, one of which charged intent to distribute and the other mere possession.  There

-10-

is no challenge to Tatro's testimony about the weight or substance contained in these baggies.

However, Tatro also testified that the sample McGhee had supplied the informant earlier in the day comprised 0.49 grams of cocaine base. Although McGhee was not charged in the indictment with possession or distribution of this sample, the evidence of the earlier sale was offered by the government to confirm that McGhee was a drug trafficker and so to support the inference that the thirty-one baggies–or some portion of them--were <u>also</u> intended for distribution. There was other evidence of intended distribution, to which we will return; but the distributed sample was evidence offered to confirm McGhee's intent as to the thirty-one baggies.

However, a different chemist, Hannah Knowles, had tested the sample, and Knowles did not testify nor were her records offered in evidence. Instead Tatro rendered an opinion as to both the nature and weight of the sample based on Knowles' case file and test results recorded in the file. McGhee made unsuccessfully at trial, and now renews on appeal, the objection that Tatro's testimony as to the sample was barred by the Confrontation Clause of the Constitution as construed in <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004), and more recently in <u>Melendez-Diaz</u> v. <u>Massachusetts</u>, 129 S. Ct. 2527 (2009).

Both cases dealt with out-of-court statements, other than admissions, offered in criminal trials against the defendant;

prior Supreme Court precedent had held such statements to be constitutional if they fell within traditional hearsay exceptions or were otherwise reliable. Ohio v. Roberts, 448 U.S. 56, 65-66 (1980). In Crawford, the Supreme Court established as a constitutional rule that where the out-of-court statements were "testimonial," the sine qua non of admissibility was a prior opportunity by the defendant to cross examine the out-of-court "witness" and the unavailability of that witness as well, 541 U.S. at 53-54, 68.

Then, in Melendez-Diaz, a sharply divided Court applied the Crawford ban to a lab technician's certification that cocaine seized by the police was of a certain quality and quantity, 129 S. Ct. at 2532. This overturned the common practice in many state courts of using such certificates in drug and other prosecutions. Id. at 2543 (Kennedy, J., dissenting). The Supreme Court's new slant on the Confrontation Clause is likely to be contested territory for some years, although the recent grant of certiorari in State v. Bullcoming, 226 P.3d 1 (N.M. 2010), cert. granted, 79 U.S.L.W. 3194 (U.S. Sept. 28, 2010) (No. 09-10876), may lead to some clarification.

In the meantime, McGhee relies heavily upon Melendez-Diaz, claiming that Tatro's testimony simply channeled Knowles' report. This case can doubtless be distinguished from Melendez-Diaz: in particular, Knowles' report was not introduced in

-12-

evidence, nor did Tatro's testimony comprise a direct recitation of that report, as in Davis v. Washington, 547 U.S. 813, 826 (2006). The problem is further complicated because Justice Thomas, who made up the needed fifth vote in Melendez-Diaz, 129 S. Ct. at 2543 (Thomas, J., concurring), had a narrower interpretation of Crawford, and it is unclear whether he would regard Tatro's testimony, relying only in part on Knowles' work, as amounting to a forbidden introduction of Knowles' own report, even assuming that he regarded the latter as a "testimonial statement" subject to Crawford.

What may matter even more is that Tatro's testimony that the sample was cocaine base did not rest on Knowles' conclusion alone. Knowles' report furnished technical test data, which in some measure permitted Tatro to draw her own scientific conclusion as to the nature of the sample; Tatro, who worked in the same lab, understood the testing methodologies and protocols used by Knowles. Experts who testify regularly in court commonly and permissibly rely in some measure on information gathered by other experts. Fed. R. Evid. 703. A number of lower court cases have distinguished Melendez-Diaz on this basis.[5]

---

[5]E.g., United States v. Turner, 591 F.3d 928, 931-33 (7th Cir. 2010); United States v. Williams, Criminal No. 09-0026 (PLF), 2010 WL 4071538, at *4-*5 (D.D.C. Oct. 18, 2010); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4-*8 (D.N.M. Aug. 7, 2010); see also United States v. Winston, 372 F. App'x 17, 19-20 (11th Cir. 2010) (per curiam); United States v. Johnson, 587 F.3d 625, 634-36 (4th Cir. 2009), cert. denied, 130 S. Ct. 2128 (2010);

-13-

On the other hand, Tatro's conclusion as to the substance of the sample did depend in part on Knowles' work. The quality and quantity of dependence is going to vary from case to case and, absent clarification by the Court, how Rule 703 and Melendez-Diaz are to be reconciled may, in some cases, involve case-by-case assessments. However, the issue needs no further discussion here for even if we assume arguendo that Melendez-Diaz barred Tatro's testimony as to the identity of the sample, the error was patently harmless beyond a reasonable doubt. As for the weight of the sample--where Tatro's testimony did depend entirely on Knowles' weighing and was likely inadmissible, see Mirabal, 2010 WL 3834072, at *7-*8--that evidence was virtually irrelevant.

Officer testimony, essentially uncontradicted, showed that McGhee had sold a sample during the controlled drug buy; and officers testified that, by field test and observation, the sample was a small amount of cocaine. Thus, the officer testimony provided a basis for the jury to conclude without regard to Tatro's testimony that the sample was cocaine; further, in making the sale, McGhee appeared to be holding himself out as a drug dealer. Both facts--the cocaine sale and the holding out--were themselves relevant only for an inference that at least some of the thirty-one

United States v. Darden, 656 F. Supp. 2d 560 (D. Md. 2009); Larkin v. Yates, No. CV 09-2034-DSF (CT), 2009 WL 2049991, at *1 (C.D. Cal. July 9, 2009).

baggies that McGhee had secreted on his body were also intended for sale.

That intention, however, was <u>independently</u> established by the empty bag ends in the hotel room, by the multiple cell phones, by McGhee's possession (while unemployed) of a large cache of bills, and by the large quantity of cocaine in the thirty-one baggies. The jurors also had Officer Stone's testimony that a user of crack cocaine would normally have one or two packets of cocaine, not thirty-one. So it is hard to imagine that, even if the sample sale had been excluded in its entirety, a jury could have avoided concluding that some portion of the thirty-one baggies was intended for distribution.

Of course, <u>how much</u> of the cocaine in the thirty-one baggies was intended for distribution was a disputed issue; at least, given the verdict, the jurors were not able to agree that all of those baggies were intended for distribution rather than consumption.[6] Still, whether McGhee's prior (uncharged) sale was of cocaine added almost no information about the percentage intended for sale of the drugs actually seized on arrest. The other evidence overwhelmingly established that McGhee held at least

---

[6]Additionally, the jurors asked during deliberation, "Can we agree on 1 count of the verdict (i.e. #1 or 2) and not on the other?" They also posed two questions about "alternative explanations" and their effect on reasonable doubt, enquiring whether an alternative explanation unsupported by evidence or unargued by the defense would constitute reasonable doubt.

some of the baggies for distribution; and intended distribution, with no minimum amount, was all the jury found on that count.

McGhee's third and final claim centers upon his designation during sentencing as a career offender. Career offender status normally increases significantly the guideline range assigned to a convicted defendant, U.S.S.G. § 4B1.1, the range usually influencing in some measure the ultimate sentence, id. § 5; see United States v. Booker, 543 U.S. 220, 245-46 (2005). Career offenders must have committed "at least two prior felony convictions of either a crime of violence or a controlled substance offense," U.S.S.G. § 4B1.1(a); at issue was whether McGhee's youthful offender adjudication for armed robbery and assault with a dangerous weapon would count as the second prior felony conviction.

Initially, the district court considered certifying the question to the Massachusetts Supreme Judicial Court to determine whether it would classify the offense as an adult conviction. See id. § 4B1.2 cmt. n.1. However, United States v. Torres, 541 F.3d 48 (1st Cir. 2008), cert. denied, 129 S. Ct. 1987 (2009), intervened; the district court held that it was directed by Torres to count the youthful offender adjudication as a prior felony conviction. McGhee concedes in his appellate brief that Torres controls his case; he "raises this challenge . . . in order to preserve the issue for further en banc review."

-16-

Ordinarily, with exceptions not applicable here, one panel in this circuit must follow a legal ruling by another panel, Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc), cert. denied, 528 U.S. 812 (1999); accordingly, we follow Torres and uphold the district court's sentencing decision, but McGhee's opportunity to seek en banc reconsideration to challenge Torres is duly preserved.  Also preserved is his further argument, based on the Fair Sentencing Act of 2010, that (if Torres were overturned) the resulting error in classifying him as a career offender would not be harmless as to him.

Affirmed.