NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-199                                          Appeals Court


COMMONWEALTH  vs.  DONNE K. AGOGO.


No. 17-P-199.

Suffolk.     January 10, 2018. - June 29, 2018.

Present:  Trainor, Meade, Hanlon, Sullivan, & Henry, JJ.[1]


Constitutional Law, Search and seizure, Probable cause.  Search
    and Seizure, Body examination, Probable cause.  Probable
    Cause.  Practice, Criminal, Motion to suppress.




Complaint received and sworn to in the Chelsea Division of
the District Court Department on March 28, 2016.

A pretrial motion to suppress evidence was heard by D.
Dunbar Livingston, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Margot Botsford, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


Amanda Teo, Assistant District Attorney, for the
Commonwealth.

─────────────────────

[1] This case was initially heard by a panel comprised of
Justices Meade, Sullivan, and Henry.  After circulation of a
majority and a dissenting opinion to the other justices of the
Appeals Court, the panel was expanded to include Justices
Trainor and Hanlon.  See Sciaba Constr. Corp. v. Boston, 35
Mass. App. Ct. 181, 181 n.2 (1993).

Michael A. Frates for the defendant.

MEADE, J. The defendant was charged by complaint in Chelsea District Court with distribution of a Class B controlled substance, conspiracy to violate the drug laws, and possession of cocaine with the intent to distribute. He filed a motion to suppress evidence and statements, and challenged the validity of a strip search. After an evidentiary hearing, the judge issued written findings which allowed, in part, the defendant's motion as it related to evidence seized pursuant to the strip search, concluding that it was not supported by probable cause and conducted in violation of a written strip search policy. The Commonwealth filed a timely notice of appeal. A single justice of the Supreme Judicial Court allowed the Commonwealth's application for leave to pursue an interlocutory appeal and reported the matter to this court. See G. L. c. 278, § 28E; Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). We conclude that the strip search was proper and therefore reverse the order which allowed, in part, the motion to suppress.

1. Background. The entirety of the Commonwealth's evidence at the suppression hearing was provided by Chelsea police Detective Jose Torres, Jr. Based on the evidence the judge found credible, he made the following findings of fact:

a. <u>The surveillance</u>. At the relevant time, Detective Torres had been a member of the Chelsea police department for approximately eight and one-half years. For approximately the last one and one-half years, Torres had worked as a detective assigned to the drug unit.[2]

Torres was familiar with the Bellingham Square area of Chelsea. The Bellingham Square area is considered to be a high crime area. On March 25, 2016, Torres was working with Lieutenant Betz of the Chelsea police department conducting surveillance from an unmarked cruiser while in plain clothes. At approximately 9:00 P.M., Torres and Betz were parked on Fourth Street between the intersection of Broadway and Division Street, an area adjacent to Bellingham Square. This location, which is both residential and commercial, was chosen for surveillance after the police received citizen complaints of street level drug dealing and drug use in this area.

---

[2] While in the drug unit, Torres participated in approximately fifty drug investigations. Prior to being assigned to the drug unit, Torres participated in over one hundred drug related arrests. At the outset of his police career, Torres completed a training course at the Lowell Police Academy in basic police practices and procedures. During his career as a police officer, Torres received regular training, including instruction in drug recognition, common methods of packaging for street level drug distribution, quantities of drugs commonly bought and sold on the street, and street terms often used in the drug trade. During his time as a member of the Chelsea police department, Torres witnessed in excess of seventy street-level hand-to-hand drug transactions.

Torres and Betz focused their attention on a multifamily residential building located at 9-11 Fourth Street (the building).  The building was approximately eighty feet from the police surveillance position and on the same side of the street. From their vantage point, the officers had a largely unobstructed, well-lit view of the front area of the building.

b.  <u>The defendant arrives</u>.  After approximately twenty minutes of surveillance, Torres observed a person, later identified as the defendant, arrive at the front of the building.  The defendant was accompanied by a woman.  The defendant was not previously known to Torres and Betz.  The defendant and the woman stood on the sidewalk in front of the building.  On several occasions, Torres observed the defendant enter the building, remain inside the building and out of view for approximately thirty seconds, and then return to the sidewalk in front of the building.  On at least one of these occasions, the woman accompanied the defendant into the building.  Based upon his experience and training, Torres knew that it is common practice for persons engaged in street level drug distribution to not have drugs on his person.  Instead, some drug purveyors keep drugs nearby in a "stash" location and periodically retrieve small quantities of drugs from it to sell, and then return to the stash location to retrieve another small quantity of drugs for the next sale.

Torres watched people walk in front of the building, passing by the defendant as he stood in front of the building. He saw the defendant attempt to initiate conversations with some of the pedestrians as they passed him. On one occasion, Torres saw the defendant walk with one of the pedestrians around the corner of Fourth Street onto Division Street, where they were out of view for five to ten minutes, and then return to the front of the building. Based upon his training and experience, Torres knew that it was common practice for drug dealers to consummate a drug transaction on a side street out of view in order to avoid detection. Fourth Street is a main street in Chelsea, while Division Street is a side street.

c. <u>The hand-to-hand sale</u>. After conducting surveillance for approximately twenty to twenty-five minutes, Torres saw a man, later identified as James Foster, walk by the front of the building, stop, and appear to speak with the defendant.[3] Foster was unknown to the police. From his vantage point, Torres could see Foster "manipulating something in his hands" as he spoke with the defendant. Torres believed that Foster's hand movements were consistent with someone counting currency. The defendant and Foster then walked together on Fourth Street toward the surveillance position and turned right onto Division

---

[3] The woman had left at some point during the period of surveillance prior to Foster's arrival.

Street out of police view. Torres believed that a drug transaction was about to take place.

The police officers drove their cruiser on Fourth Street toward the building, turned left onto Division Street, and activated their emergency lights. As they turned onto Division Street, Torres saw the defendant and Foster standing face-to-face. It appeared that the defendant was handing an item to Foster, but Torres could not see the item. Foster was wearing a hooded sweatshirt with a pouch-like pocket in front that was accessible from the right or left side. After the interaction between the defendant and Foster, Torres watched Foster put his hands into the sweatshirt pocket. Based upon his experience and training, Torres believed that he had witnessed a hand-to-hand drug transaction. Having seen this, the officers drove up to where the defendant and Foster were standing and got out of the cruiser. Torres approached Foster. Betz approached the defendant. Both officers had their police badges displayed and they identified themselves as police officers.

d. The defendant's arrest. Torres told Foster that he was being stopped because the officers believed Foster was involved in a drug transaction. Torres told Foster to take his hands out of his sweatshirt pocket. Foster hesitated to comply with the order. Foster told Torres that he had a knife in his sweatshirt pocket; Torres was concerned for his safety. Torres removed the

knife from the sweatshirt pocket. The knife was a folding knife. Upon removing the knife, Torres observed in the pocket a clear plastic knotted bag containing a white powdered substance. Based upon his experience and training, Torres believed that the substance was cocaine packaged for street-level distribution. Foster was placed under arrest.

During the time that Torres spoke with Foster, Betz and the defendant stood about ten feet away. After arresting Foster, Torres approached Betz and the defendant. The defendant was not being compliant with Betz's orders. The defendant appeared to be upset and had taken a "bladed" stance toward Betz, i.e., a fighting stance. The defendant was "pulling away" from the police, apparently attempting to prevent Betz from conducting a search of his person. The defendant was "animated" in his speech and gestures; the officers were concerned for their safety. The defendant was pat frisked, which revealed nothing of significance. During a search of the defendant, the officers seized a twenty dollar bill. The defendant was arrested.

e. <u>Booking and strip search</u>. The defendant was transported to the station house and brought to the booking area. The officers commenced a routine booking procedure with the defendant. At some point, the booking procedure was suspended. The officers believed that the defendant, who had conducted a drug transaction, may have drugs concealed on his

person because they had not found any drugs during the search incident to his arrest at the scene. Based upon his experience and training, Torres knew that persons engaged in street-level drug transactions commonly hid drugs in their crotch. The officers decided that a more thorough search of the defendant was necessary, and Betz decided to conduct a strip search of the defendant. The Chelsea police department has a written "Strip and Body Cavity Search Policy." Pursuant to that policy, Betz advised the defendant that he was going to be subjected to a strip search. The defendant responded in an "animated" manner, telling the police that they were "not going to do that."

Torres and Betz escorted the defendant to a cell near the booking area for the purpose of conducting a strip search. The cell was a private area. Only Torres, Betz, and the defendant were present during the search. Betz explained the strip search process to the defendant. The defendant was directed to remove his shirt, pants, underwear, shoes, and socks. He complied. Torres observed a red bandana in the defendant's crotch area, which was seized. Wrapped inside the bandana were seven small bags which contained a white powdered substance believed to be cocaine. The defendant's clothes were returned to him, and the booking procedure was completed.

Based on this evidence, in a thoughtful memorandum of law, the motion judge determined that the stop, patfrisk, and seizure

of money from the defendant, along with his arrest, were lawful. However, the motion judge concluded that the strip search was not supported by probable cause and was not conducted in accordance with the Chelsea police department's written strip search policy. Specifically, the motion judge concluded that "[t]he mere fact that the police did not find drug contraband on the defendant in their initial search incident to arrest cannot serve, absent other supporting facts not present here, to justify a strip search." However, because there are other facts here that support a finding of probable cause, this was error.

2. Discussion. a. Probable cause. The defendant claims, and the motion judge concluded, that the police lacked probable cause to justify the strip search of the defendant. We disagree for the following reasons.

There is no dispute that the police had probable cause to arrest the defendant for possession of cocaine with the intent to distribute, and to search him incident to that arrest, as they had witnessed him sell cocaine to Foster. Indeed, "[o]nce a custodial arrest occurs, as did here, no additional justification is required for a search of the person for weapons that otherwise might be used to resist arrest or to escape, or to discover evidence of the crime for which the arrest was made." Commonwealth v. Prophete, 443 Mass. 548, 552 (2005). See G. L. c. 276, § 1. To lawfully extend an initial search

into a strip search,[4] the strip search must be "justified by probable cause to believe that the defendant had concealed [cocaine] on his person or his clothing that would not otherwise be discovered by the usual search incident to arrest." Commonwealth v. Prophete, supra at 554. See Commonwealth v. Thomas, 429 Mass. 403, 408 (1999). See also Cypher, Criminal Practice and Procedure § 5:133, at 450-542 (4th ed. 2014).

"Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Commonwealth v. Hason, 387 Mass. 169, 174 (1982), quoting from Brinegar v. United States, 338 U.S. 160, 175-176 (1949). See Carroll v. United States, 267 U.S. 132, 162 (1925). "The officers must have entertained rationally 'more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.'" Commonwealth v. Keefner, 461 Mass. 507, 517 (2012), quoting from Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992). See Texas v. Brown, 460 U.S. 730, 742 (1983)

---

[4] Here, there is also no dispute that the defendant was strip searched. See Commonwealth v. Vick, 90 Mass. App. Ct. 622, 628 (2016).

(probable cause "does not demand any showing that" a reasonable belief that contraband may be concealed is "correct or more likely true than false"); Commonwealth v. Garcia, 34 Mass. App. Ct. 645, 650 (1993) (same).  Indeed, in cases involving the seizure of contraband, "probable cause is a flexible, common-sense standard."  Carroll v. United States, supra.  In the end, "[i]n dealing with "probable cause . . . we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Brinegar v. United States, supra at 175.  See Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 8-1 (2017).

Probable cause must be determined based on the totality of the circumstances known to the police.  See Commonwealth v. Prophete, supra at 554-555; Commonwealth v. Hernandez, 448 Mass. 711, 715 (2007).  The facts and circumstances are to be viewed collectively, not in isolation.  See Commonwealth v. Santaliz, supra at 241; Commonwealth v. Lawrence L., 439 Mass. 817, 823 (2003).

Several factors and circumstances in this case establish probable cause to believe that the defendant was secreting contraband on his person; as a result, the strip search was justified.  What occurred can be distilled into six salient facts and circumstances:  (1) the police were conducting

surveillance in an area known for illegal drug dealing; (2) the defendant's conduct was consistent with someone engaged in street-level drug dealing; (3) the police witnessed the defendant sell cocaine to Foster; (4) the defendant attempted to evade, in an animated manner, a search of his person at the scene; (5) based on Torres's experience and training, he knew that the crotch area is commonly used by drug dealers to conceal narcotics; and (6) at the police station, when the police told the defendant they were going to conduct a strip search, the defendant again protested in an animated fashion.

Based on the salient facts outlined in (1) though (5), there was sufficient reasonably trustworthy information to warrant a person of reasonable caution to believe that the defendant still had drugs on his person. See Commonwealth v. Prophete, 443 Mass. at 554-555. While this defendant did not use his hands to protect the area of his groin,[5] as occurred in Prophete, he did attempt to evade, in an animated manner, a search of his person at the scene, although no drugs were then discovered. This behavior, coupled with the fact that the

_____

[5] The Commonwealth seeks to add an additional "key fact" that it claims the motion judge "ignored," which is Torres's testimony that the defendant was "distancing" his "crotch area" from the police. While the evidentiary support for this was thin at best, and the judge was not required to credit that testimony, we need not resolve the issue because probable cause existed even in the absence of such evidence.

defendant was selling drugs in a high crime area known for drug dealing, coupled with Torres's experience and training regarding dealers secreting drugs in their crotch area, are factual and practical circumstances that could leave a reasonable and prudent person with the belief that the defendant was still concealing drugs on his person. See Brinegar v. United States, supra at 175.

This conclusion becomes even more apparent if the salient fact in (6) is added to the probable cause calculus, i.e., when told that he was going to be strip searched, the defendant staged an animated protest in the booking area.[6] While it is, of course, understandable that a person would not relish the indignity of a strip search, the probable cause inquiry does not require the government to exclude other possible explanations for behavior or circumstances that do not equate to probable cause. See Commonwealth v. Hason, 387 Mass. at 175 ("Probable cause does not require a showing that the police resolved all their doubts"). Indeed, even when proving guilt beyond a

---

[6] Contrary to the dissent's suggestion, see post at _[13]__ n.9, the judge found that "Betz advised the defendant that he was going to be subjected to a strip search. The defendant responded in an animated manner telling the police that they were 'not going to do that.'" Characterizing this as an animated protest against a strip search or as consciousness of guilt neither changes the judge's finding of fact nor contravenes Commonwealth v. Jones-Pannell, 472 Mass. 429, 431-432 (2015).

reasonable doubt, the government is not charged with excluding hypotheses of innocence. See Commonwealth v. Merola, 405 Mass. 529, 533-534 (1989) (Commonwealth "need not exclude every reasonable hypothesis of innocence [to prove its case], provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt" [quotation omitted]). Put another way, and viewing all the facts and circumstances before the motion judge together, the mere possibility that the defendant may have been innocently motivated in avoiding the strip search does not necessarily mean the police, who are equipped with specialized training and experience, were not justified in believing he was concealing drugs. See Commonwealth v. Freeman, 87 Mass. App. Ct. 448, 454 (2015) ("While there could have been an innocent explanation for the events observed by [the detective], he was entitled to view them through the lens of his specialized training and experience and conclude that more than mere coincidence was involved"). In fact, even if the factors justifying probable cause do not rise to the level of prima facie evidence, see Commonwealth v. Santaliz, 413 Mass. at 241, or even if they turn out to be incorrect, probable cause is not negated. See Commonwealth v. Skea, 18 Mass. App. Ct. 685, 701 (1984); Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 8-1.

At bottom, the defendant's animated protest to the strip search may properly be considered in gauging whether it was supported by probable cause. See Commonwealth v. Battle, 365 Mass. 472, 476 (1974). See also United States v. McGhee, 627 F.3d 454, 458-459 (1st Cir. 2010) (where officers told defendant they were going to complete search of him, and he protested, "saying that they could not 'stick a finger up [his] ass,'" this "pattern of behavior was a reasonable signal that drugs were likely concealed within"). On this matter, the dissent endeavors to be the legal technicians the probable cause formulation long ago warned against. See Brinegar v. United States, supra at 175. In fact, the dissent's choice to isolate the possibility that there may be reasons other than guilt to explain the defendant's opposition to the strip search fails to appreciate the flexible, lenient, and common sense approach of the probable cause inquiry. See Texas v. Brown, 460 U.S. at 735.

There is similarly no merit to the dissent's assertion that because the police lacked probable cause "at the time" they told the defendant they were going to conduct the strip search, see post at _[13]_, the defendant's protest cannot be used in the probable cause analysis. Even if this were true (and as outlined above, it is not), the fundamental flaw of this assertion is that probable cause to support a strip search must

objectively exist "at time the search was made," <u>Commonwealth</u> v. <u>Amado</u>, 474 Mass. 147, 154 (2016), not when the police officers subjectively determined they would conduct one and so informed the defendant.  See 2 LaFave, Search & Seizure § 3.2(d), at 58 and n.104 (5th ed. 2012) (mistake to assert that probable cause must exist "at the moment the decision is made," but rather probable cause is properly determined, based on "totality of facts" available to police, "at the time of the arrest or search" [quotation omitted]).  See also <u>Commonwealth</u> v. <u>Alvarado</u>, 420 Mass. 542, 551 (1995) (unnecessary to determine "at precisely what point the probable cause arose; it is sufficient that it existed at the time that [the officer] conducted his search of [defendant's] person").  Cf. <u>Commonwealth</u> v. <u>Murdough</u>, 428 Mass. 760, 765 (1999) ("<u>Whren</u> v. <u>United States</u>, 517 U.S. 806[, 812] (1996), teaches that, if the objective circumstances justify the action taken, that is enough").[7]

---

[7] Contrary to the dissent's view, see <u>post</u> at _[12-13]__, the motion judge did not find that the defendant consistently returned to the building to "re-up" in order "to not have a drug stash on their person."  The judge made no such finding, and if he had, it would not have been properly supported by the record.  Although the police saw the defendant going in and out of the nearby building, and Torres was aware that it is "common practice" for street-level drug dealers to use "a stash location" rather than storing drugs on their person, there was no evidence that this defendant did so.  In fact, it is just as likely that the defendant held more drugs on his person for each sale because he was without knowledge as to how much each buyer

The totality of the circumstances, when viewed collectively, provided sufficient factual and practical considerations, from which a reasonable and prudent person could conclude that the defendant was concealing drugs on his person.[8]

---

intended to purchase.  In the end, practical considerations of everyday life would leave a prudent person, with knowledge of methods of concealing narcotics on a dealer's person, to reasonably conclude that the defendant's animated opposition to a further search of his person indicated that he was either not employing a stash at the building, or that he was, but nevertheless also possessed drugs from that stash on his person.  See Commonwealth v. Thomas, 429 Mass. at 408-409.  See also Commonwealth v. Battle, 365 Mass. at 476 (considering totality of circumstances, consciousness of guilt can be important factor when determining whether probable cause exists).

[8] The dissent relies on Commonwealth v. Warren, 475 Mass. 530, 539 (2016), in support of its claim that if the facts, circumstances, and police knowledge in this case were enough evidence to justify a strip search, then "'our long-standing jurisprudence' requiring particularized probable cause 'will be seriously undermined.'"  See post at _[11]__.  However, the dissent's reliance is misplaced.  The defendant in Warren ran away from the police, who merely had a hunch that he was involved in a breaking and entering.  Commonwealth v. Warren, supra at 532.  The court held that "evasive conduct in the absence of any other information tending toward an individualized suspicion that the defendant was involved in the crime is insufficient to support reasonable suspicion."  Id. at 538.  Here, as cataloged above, the defendant's animated protest against the search (behavior not in the nature of flight) occurred in the police station, after the police watched him sell cocaine to Foster, and after he was under arrest for that crime.  Not only was the police interaction with the defendant not based on merely a hunch, but the fact that his arrest was supported by probable cause is not even challenged.  Also unlike Warren, the defendant's behavior did not occur as a means to avoid a "consensual" encounter with the police.  Here, the defendant's freedom to avoid the police had long since ended.  Contrast Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981) (quick maneuver to avoid contact with police insufficient to establish reasonable suspicion).

b. Strip search policy. The motion judge also concluded that the strip search of the defendant failed to comply with the Chelsea police department's written strip search policy (the policy) because the search was not authorized by the "officer in charge." This was not a ground raised in the defendant's motion to suppress or in his affidavit in support thereof. See Mass.R.Crim.P. 13(a)(2), as appearing in 442 Mass. 1516 (2004) ("Grounds not stated which reasonably could have been known at the time a motion is filed shall be deemed to have been waived"). Although the policy was made an exhibit at the hearing, the defendant did not make the "officer in charge" claim until after the evidence was closed, and after the Commonwealth could have cured any ambiguity. Despite this, the judge relied on it in his decision, and we will assume the claim is not waived. See Commonwealth v. Vargas, 475 Mass. 338, 343 n.6 (2016).

The policy does not define the phrase "officer in charge." The evidence at the suppression hearing was that Detective Torres and Lieutenant Betz did not together make the decision to conduct a strip search, because the decision was for Betz alone to make. Later, Torres clarified that because Betz was Torres's "commanding officer," Betz made "the final decision to authorize the strip search." Although the judge concluded that the strip search was not authorized by the "officer in charge," he did not

do so by finding that a "commanding officer" does not qualify as an "officer in charge." Rather, he mistakenly stated that there was no testimony supporting the conclusion that Betz was the commanding officer, which is clearly erroneous.[9] See Commonwealth v. Castillo, 89 Mass. App. Ct. 779, 781 (2016). Thus, the procedure Torres followed prior to the strip search conformed to the policy's requirement for an arresting officer to receive prior approval from a commanding officer.

However, even if Betz's prior approval as the commanding officer did not satisfy the policy's dictates, neither the Supreme Judicial Court nor this court has required adherence to such a policy to find a strip search justifiable. Commonwealth v. Vick, 90 Mass. App. Ct. at 631 n.15. Indeed, not adhering to such a policy is not determinative of the reasonableness of a search; it is only one factor in the analysis. See Commonwealth v. Morales, 462 Mass. 334, 343 n.9 (2012); Commonwealth v. Vick, supra at 631.

Instead, the reasonableness of a strip search is assessed by a variety of factors, such as privacy in the place where the search is conducted, minimizing the number of persons present during the search, and having a person of the same gender as the defendant conduct the search; each case is to be judged on its

_____

[9] The judge did not have the benefit of the transcript at the time.

own facts. See Commonwealth v. Morales, supra at 342-343 and cases cited. Here, it is important to note that the defendant has not claimed that the manner or place in which the strip search was conducted was unreasonable, and the judge did not so find. Rather, the judge found that the strip search was conducted by Torres and Betz (two male officers) in a private cell near the booking area. Betz explained the process to the defendant, who was directed to remove his clothing, and he complied. When the red bandana concealing the seven bags of cocaine was revealed, it was seized, whereupon the defendant's clothes were returned to him.

In view of the above factors, this strip search was conducted in a reasonable and respectful manner, which outweighed the lack of prior approval by the officer in charge, to the extent that that occurred at all. See Commonwealth v. Vick, supra at 632. In this posture, there is no occasion to apply the exclusionary rule. See Commonwealth v. Wilkerson, 436 Mass. 137, 142 (2002) (because police officers "did nothing wrong, there is no unlawful conduct for exclusion of the evidence to deter").

3. Conclusion. As the strip search was supported by probable cause and conducted reasonably, it was error to suppress the fruits of that search. We reverse so much of the

order allowing the motion to suppress the evidence obtained as a result of the strip search.

<u>So ordered</u>.

SULLIVAN, J. (dissenting, with whom Henry, J., joins). Today's decision blurs the distinction between probable cause to search (which was present here) and probable cause to conduct a strip search (which was not), and dispenses with the need for the type of specific, particularized probable cause to conduct a strip search required since Commonwealth v. Thomas, 429 Mass. 403, 408-409 & n.5 (1999). For this reason, I respectfully dissent.

The Supreme Judicial Court has held that "the search of the defendant lawfully could progressively extend into a strip (or a visual body cavity) search only if such a search was justified by probable cause to believe that the defendant had concealed [drugs] on his person or his clothing that would not otherwise be discovered by the usual search incident to arrest." Commonwealth v. Prophete, 443 Mass. 548, 554 (2005). In so holding, the court departed from Federal cases, and instead required that a strip search be based on probable cause to believe that drugs, weapons, or contraband were hidden in such a way that a more intrusive search was justified. See id. at 553-554, citing Bell v. Wolfish, 441 U.S. 520, 559 (1979).

On the facts found by the motion judge, the evidence here was insufficient to establish probable cause to believe that the defendant had secreted drugs in such a way as to necessitate a strip search. Because the police lacked probable cause to

believe that they would find contraband in the private areas of his body, they lacked a lawful basis to conduct a strip search, that is a search which requires "the arrested person to discard all of his or her clothing," Commonwealth v. Prophete, supra at 556, or in which the "last layer of clothing is moved . . . in such a manner whereby an intimate area of the detainee is viewed, exposed, or displayed." Commonwealth v. Morales, 462 Mass. 334, 342 (2012).

These are the relevant facts as found by the motion judge, supplemented by undisputed facts that he implicitly credited, and that are consistent with his ruling. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015); Commonwealth v. Depiero, 473 Mass 450, 452 n.3 (2016).[1] We repeat them here because fealty to the supported findings is central to the case.

On March 25, 2016, at approximately 9:00 P.M., Officer Jose Torres, Jr. and Lieutenant Betz of the Chelsea police department drug unit were conducting surveillance near the Bellingham Square area of Chelsea. The officers had received citizen complaints of illegal drug activity and prostitution in the general area of their surveillance position. The officers

---

[1] The motion judge's findings were prefaced with the statement: "Based upon the credible evidence presented at the hearing on the defendant's motion to suppress on August 19, 2016, the court finds as follows."

focused on a multifamily residential building located at 9-11 Fourth Street (building).

After twenty minutes, Torres saw the defendant, whom he did not know, arrive at the front of the building with a woman. On three to five occasions, Torres saw the defendant go into the building, remain inside the building and out of view for thirty seconds, and then "take a short walk" of five or ten minutes duration. He then returned and went into the building again. Torres testified that it is "common practice for street-level dealers to retrieve the item that they're looking to sell, the narcotics, and make that [sale] and then return back to the stash location . . . and re-up."

The judge credited this testimony explicitly, stating that Torres was "aware that it is common practice for persons engaged in street level drug distribution to not have a drug stash on their person, but to retrieve a small quantity of drugs from a stash location, sell the drugs, and then return to the stash location to retrieve another small quantity of drugs to sell."[2]

_____

[2] The judge described Torres, the only witness to testify at the suppression hearing, as a highly experienced officer who had received "in service training" in drug recognition and distribution, and who had participated in fifty drug investigations while a member of the drug unit, had made over 100 drug arrests before joining the drug unit, and had witnessed over seventy street-level hand-to-hand drug transactions.

Consistent with Commonwealth v. Jones-Pannell, supra, we treat this as the judge's finding on this issue.

After twenty-five minutes of surveillance, Torres saw a pedestrian, later identified as James Foster, speaking with the defendant in front of the building. As set forth in the majority opinion, the police observed what they believed to be a hand-to-hand drug transaction, leading to Foster's arrest and the discovery of drugs in the pocket of Foster's sweatshirt.

After placing Foster under arrest, Torres approached Betz and the defendant. The defendant was upset, animated in his speech and gestures, and did not comply with Betz's orders. He took a "bladed" stance, which the judge found to be a "fighting" stance. The defendant pulled away from the officers in an "apparent[] attempt[]" to prevent Betz from searching him. The officers eventually conducted a search of the defendant and found no weapons or drugs, but did discover a twenty dollar bill, a dollar value consistent with the amount of cocaine discovered on Foster. The defendant was placed under arrest and transported to the police station.

During booking, the officers decided that a more thorough search of the defendant was necessary to determine if he had concealed drugs on his person. This decision was based on the fact that they had not found drugs during the search, and Torres's belief that the groin area was a common place for

dealers to hide their contraband to avoid detection from law enforcement.

Betz informed the defendant that he was going to be strip searched. In response, the defendant became animated and stated that the officers were "not going to do that."[3] Torres and Betz brought the defendant to a private cell and explained the strip search process. The defendant complied with the command to remove his shirt, pants, underwear, socks, and shoes. The officers saw a red bandana in the defendant's crotch area. Upon inspection of the red bandana, the officers discovered seven small bags containing a white powdered substance believed to be cocaine.

The motion judge concluded that the fact that the police did not find drugs on the defendant during the initial search was not, "absent other supporting facts not present here," sufficient to justify the strip search.

Discussion. In reviewing a decision on a motion to suppress, we must accept the motion judge's "subsidiary findings absent clear error but conduct an independent review of the ultimate findings and conclusions of law." Commonwealth v. Jones-Pannell, 472 Mass. at 431 (quotation omitted). Inferences to be drawn from the testimony, the weight of the evidence, and

---

[3] Torres testified that the defendant "was being animated, passive, not willing to comply."

questions of credibility are for the motion judge, not an appellate court. See id. at 431-432 & n.3; Commonwealth v. Tremblay, 92 Mass. App. Ct. 295, 297 n.3 (2017).

"[S]trip or bodily cavity searches, by their very nature, are humiliating, demeaning, and terrifying experiences that, without question, constitute a substantial intrusion on one's personal privacy rights." Commonwealth v. Prophete, 443 Mass. at 553, citing Commonwealth v. Thomas, 429 Mass. at 408-409 & n.5. For this reason, to conduct a strip search in the Commonwealth, the "police must have probable cause to believe that 'they will find a weapon, contraband, or the fruits or instrumentalities of criminal activity that they could not reasonably expect to discover'" without removing all clothing or exposing intimate areas of the defendant's body. Commonwealth v. Vick, 90 Mass. App. Ct. 622, 628 (2016), quoting from Commonwealth v. Prophete, 443 Mass. at 556.[4] See Commonwealth v. Morales, 462 Mass. at 342.

This means that the officers had to have probable cause to believe that the defendant was hiding drugs in the intimate areas of his body, and that moving or removing all his clothes

_____

[4] In addition, "to pass constitutional muster, the strip searches must have been reasonably conducted under the circumstances." Commonwealth v. Amado, 474 Mass. 147, 157-158 (2016) (Gants, C.J., dissenting). The motion judge did not find that the search was executed in an unreasonable manner, and no argument of that sort is made on appeal.

would be necessary to find them.  However, such probable cause is lacking here.  The police did not report feeling any object near the defendant's groin or buttocks.  Contrast Commonwealth v. Clermy, 421 Mass. 325, 327 (1995) (officer felt hard object in genital area during patfrisk and retrieved object); Commonwealth v. Amado, 474 Mass. 147, 158 (2016) (Gants, C.J., dissenting) (officer "felt a hard object behind the defendant's testicles" that "was not 'part of the male anatomy'").  The motion judge made no finding that the defendant was reaching toward, reaching into, shielding, or attempting to shield his groin area or buttocks, although the Commonwealth argued for such a finding.  Contrast Commonwealth v. Prophete, supra at 554-555 ("defendant, twice, used his hands to protect the area around his groin during the officers' initial pat-down search"); Commonwealth v. Vick, supra at 624 (defendant attempted to reach his cuffed hands toward his buttocks and thereafter, officer, while performing search incident to arrest, felt hard object in cleft of defendant's buttocks).

The prosecutor expressly urged the motion judge to make a finding that the defendant was shielding his groin area.  The Commonwealth relied on Torres's testimony that he thought the defendant's "crotch area" warranted further attention because the defendant distanced himself and took a bladed stance before

the patfrisk was conducted.[5]  However, when asked by the
prosecutor what distancing meant, Torres answered that the
defendant was distancing his whole body, not any particular area
of the body.[6]  The motion judge's decision not to make a factual
finding that the defendant was shielding his groin area was
supported by the record, and was not the product of inadvertence
or oversight.  It is not for us to supplement that determination
with a contrary finding.  Commonwealth v. Jones-Pannell, 472
Mass. at 432 ("The Commonwealth essentially asks us to do what
our case law proscribes:  to rely on testimony that was neither
explicitly nor implicitly credited by the motion judge,
otherwise put, that we in essence make additional findings, and

---

[5] Q.:  "Based on your interaction with [the defendant] on
the street, was there a particular area of his body that you
thought warranted further attention?"

A.:  "Yes."

Q.:  "What was that?"

A.:  "The crotch area."

Q.:  "And why did you think that?"

A.:  "That was where he was distancing himself from us
during the encounter on the street, during the search, the pat-
frisk."

[6] Q.:  "Okay.  When you said he was trying to create
distance between the two of you, was it any specific part of his
body that he was pulling away any more than --"

A.:  "Well, just more so his body."

reach a different result, based on our own view of the evidence").

The Commonwealth has not cited, and we have not found, a Massachusetts case validating a strip search in the absence of some evidence that the contraband was hidden in a private area of the defendant's body. As just discussed, the police did not feel any object near, and did not see the defendant reach toward, his groin area. Nor was there any evidence that the defendant stayed on the street after making sales, thus permitting an inference that he had concealed drugs on his body. Contrast Commonwealth v. Thomas, 429 Mass. at 408 ("It was . . . reasonable for the police to believe that . . . because he remained on the street with the woman, . . . he had more hidden drugs"). Even Federal cases that apply a far more lenient "particularized suspicion" standard, have found strip searches unlawful absent some particularized showing that the drugs were actually hidden on the defendant's body. See, e.g., United States v. Barnes, 506 F.3d 58, 62 (1st Cir. 2007).[7]

In this case, a finding of probable cause must rest, then, on an assessment of four remaining factors: (1) the defendant

---

[7] Barnes involved a visual bodily cavity search. Under the Fourth Amendment to the United States Constitution, a strip search may be justified upon arrest for drug distribution, but a visual body cavity search requires a more particularized suspicion that contraband is being concealed. United States v. Barnes, 506 F.3d at 62.

took a fighting stance and was pulling away as if to avoid the patfrisk; (2) the defendant had previously gone inside the building to "re-up"; (3) Torres's testimony that drug dealers frequently hide drugs in the groin area; and (4) the defendant's resistance to being strip searched at the police station.

We recognize that "probable cause . . . deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Commonwealth v. Prophete, 443 Mass. at 555, quoting from Draper v. United States, 358 U.S. 307, 313 (1959).  The first three factors were sufficient to demonstrate probable cause to conduct the patfrisk and search.  However, none of the first three factors, either alone or in combination, suffice to establish probable cause to conduct a strip search of this defendant.  The Commonwealth's argument in this respect ignores the fact that the judge credited Torres's testimony that the defendant consistently returned to the building for thirty seconds at a time, in order "to not have a drug stash on [his] person."  Nor did the cash found on the defendant indicate anything more than a single sale of the amount of drugs found on Foster.[8]

---

[8] In stating his ultimate conclusions, the motion judge also specifically stated that "other . . . facts" supporting probable cause were "not present here."

Torres's general knowledge that some drug dealers "jock" drugs is insufficient to establish a particularized suspicion, much less probable cause, to believe that this defendant was doing so. See Commonwealth v. Amado, 474 Mass. at 149 ("'Jocking' refers to a suspect's attempt to hide narcotics in the buttocks area"). "The evidence . . . that [the defendant] was a suspected drug dealer in possession of narcotics and that some drug dealers conceal drugs between their buttocks -- did not endow [the officer] with an individualized suspicion that [the defendant] was 'cheeking' drugs." United States v. Barnes, 506 F.3d at 62 (invalidating body cavity search). If a generalized suspicion that a drug dealer may be carrying drugs in his groin or buttocks is enough to justify a strip search, then a strip search would be justified in virtually all drug arrests, and "our long-standing jurisprudence" requiring particularized probable cause "will be seriously undermined." Commonwealth v. Warren, 475 Mass. 530, 539 (2016).

The majority attempts to bridge this evidentiary gap in three ways. First, it relies on the evidence that a drug deal took place. That evidence is relevant to the propriety of the search incident to arrest, but says nothing about whether there were drugs on the defendant's person requiring the removal of the defendant's clothing.

Second, the majority also states that the judge's findings about the defendant returning to the building are unsupported, speculating instead that "it is also just as likely that the defendant held more drugs on his person for each sale." Ante at _[16]__ n.6. The evidence in the record on this point was to the contrary. Unlike the defendant in Commonwealth v. Thomas, 429 Mass. at 408, this defendant "re-up[ped]" after each "walk." The motion judge credited Torres's testimony explicitly and found that the defendant was going in the building to re-up for the express purpose of ensuring that there were no drugs on his person in the event of arrest. Although the motion judge did not explicitly say "and I so find" following his summary of Torres's testimony, he was not required to do so once he stated that he credited Torres's testimony. See Commonwealth v. Jones-Pannell, 472 Mass. at 431-432. Indeed, once the motion judge credited this testimony, and the reasonable inferences drawn therefrom, there is no other way to interpret his ruling. Torres did testify that some drug dealers jock drugs, but the motion judge specifically credited the testimony that this dealer did not, and, in fact, returned to the building to re-up. Whether there was probable cause to believe that the defendant was hiding drugs on his body "depends on specific facts found by the judge that underlie such a determination." Commonwealth v. Jones-Pannell, supra at 434. It was for the motion judge to

weigh the evidence and make findings.  The motion judge's findings binds us.

Third, the majority relies on the defendant's protest of the strip search, asserting that this protest, together with all the other facts and circumstances, provides a substantial basis for a finding of probable cause as a matter of law.  The defendant's statement that the officers "were not going to do that" was offered to show consciousness of guilt.[9]  This evidence may not be relied upon to tip the scales in favor of probable cause, however.  At the time that the officers told the defendant that they would strip search him, they lacked probable cause to do so.  The defendant's protest of a search without probable cause cannot create probable cause for a search.  "Were the rule otherwise, the police could turn a hunch into [probable

---

[9] As a general matter, there are many reasons why a defendant might protest a strip search, not the least of which is, as the Supreme Judicial Court has pointed out, that strip searches are a substantial and highly charged intrusion on personal privacy rights.  Commonwealth v. Thomas, 429 Mass. at 409 n.5.  While Commonwealth v. Warren, 475 Mass. at 538-539, would suggest that it is up to the judge to determine the weight of the evidence of consciousness of guilt, the judge here did not make explicit findings on that issue.  Commonwealth v. Jones-Pannell, supra at 436-438, would require that we review any implicit finding regarding consciousness of guilt in a manner consistent with, not contrary to, the motion judge's stated ruling.  However, even if we were to accede to the majority's conclusion that the motion judge was required, as a matter of law, to make a factual finding that this evidence showed consciousness of guilt, a proposition we do not accept, the evidence could not be considered for the reasons stated above.

cause] by inducing the conduct justifying the [search]." Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981). See Commonwealth v. Stoute, 422 Mass. 782, 789 (1996). This is not a "legal technician's" sleight of hand. It is bedrock constitutional law. Where, as here, the police lacked a lawful basis to demand the strip search, the defendant's protest should not be treated as consciousness of guilt in assessing the probable cause calculus. See Thibeau, supra.

A generalized suspicion that drug dealers may jock drugs, coupled with the protest of an unlawful demand for an unconstitutional search, do not probable cause make. Accordingly, I respectfully dissent.