NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC 11956


COMMONWEALTH  vs.  JIMMY WARREN.



Suffolk.     February 9, 2016. - September 20, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[1]


Firearms.  Practice, Criminal, Motion to suppress.
    Constitutional Law, Search and seizure, Reasonable
    suspicion.  Search and Seizure, Reasonable suspicion.



Complaint received and sworn to in the Roxbury Division of
the Boston Municipal Court Department on December 19, 2011.

After transfer to the Central Division, a pretrial motion
to suppress evidence was heard by Tracy-Lee Lyons, J., and the
case was heard by Annette Forde, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


Nelson P. Lovins for the defendant.
Michael Glennon, Assistant District Attorney, for the
Commonwealth.

_____

[1] Justices Spina, Cordy, and Duffly participated in the
deliberation on this case prior to their retirements.

HINES, J.    After a jury-waived trial in the Boston Municipal Court, the defendant, Jimmy Warren, was convicted of unlawful possession of a firearm, G. L. c. 269, § 10 (a).[2]  The complaint arose from the discovery of a firearm after an investigatory stop of the defendant in connection with a breaking and entering that had occurred in a nearby home approximately thirty minutes earlier.  Prior to trial, the defendant filed a motion to suppress the firearm and statements made after his arrest, arguing that police lacked reasonable suspicion for the stop.  The judge who heard the motion denied it, ruling that, at the time of the stop, the police had reasonable suspicion that the defendant was one of the perpetrators of the breaking and entering.  The defendant appealed, claiming error in the denial of the motion to suppress.[3]  The Appeals Court affirmed, Commonwealth v. Warren, 87 Mass. App. Ct. 476, 477 (2015).  We allowed the defendant's application for further appellate review and conclude that because the police lacked reasonable suspicion for the

---

[2] The trial judge allowed the defendant's motion for a required finding of not guilty on a trespass charge, G. L. c. 266, § 120.

[3] Given our conclusion, we need not address the defendant's argument about the sufficiency of the evidence supporting his conviction.

investigatory stop, the denial of the motion to suppress was error. Therefore, we vacate the conviction.

Background. We summarize the facts as found by the judge at the hearing on the motion to suppress, supplemented by evidence in the record that is uncontroverted and that was implicitly credited by the judge. Commonwealth v. Melo, 472 Mass. 278, 286 (2015). On December 18, 2011, Boston police Officer Luis Anjos was patrolling the Roxbury section of Boston in a marked police cruiser when, at 9:20 P.M., he received a radio call alerting him to a breaking and entering in progress on Hutchings Street, where the suspects were fleeing the scene. The dispatcher gave several possible paths of flight from Hutchings Street, one toward Seaver Street and the other toward Jackson Square, locations that are in the opposite direction from one another.[4]

Anjos went to the scene and spoke to the victims, a teenage male and his foster mother. The male reported that as he was leaving the bathroom in the residence, his foster mother said that she heard people in his bedroom. The victim opened his

---

[4] The record contains a map of the area in question, providing geographical context for our review of the judge's ruling that the police had reasonable suspicion for the seizure of the defendant. We may take judicial notice of the location. See Commonwealth v. Augustine, 472 Mass. 448, 457 n.14 (2015), citing Federal Nat'l Mtge. Ass'n v. Therrien, 42 Mass. App. Ct. 523, 525 (1997) ("facts that are verifiably true, such as geographic locations, are susceptible to judicial notice").

bedroom door and saw a black male wearing a "red hoodie" (hooded sweatshirt) jump out of the window. When the victim looked out the window he saw two other black males, one wearing a "black hoodie," and the other wearing "dark clothing." When the victim checked his belongings, he noticed that his backpack, a computer, and five baseball hats were missing. The victim saw the three males run down Hutchings Street, but he could only guess which direction they took thereafter. Anjos peered out the window but could only see twelve to fifteen yards up the street to the intersection of Hutchings and Harold Streets. After speaking to the victims for approximately eight to twelve minutes, Anjos left the scene and broadcast the descriptions of the suspects.

For the next fifteen minutes or so, Anjos drove a four to five block radius around the house, searching for persons fitting the suspects' descriptions. Because of the cold temperature that night, Anjos did not come across any pedestrians as he searched the area. At around 9:40 P.M., Anjos headed back toward the police station. While on Martin Luther King Boulevard, he saw two black males, both wearing dark clothing, walking by some basketball courts near a park. One male wore a dark-colored "hoodie." Neither of the two carried a backpack. Anjos did not recognize either of the males, one of

whom was the defendant, as a person he had encountered previously in the course of his duties as a police officer.

When Anjos spotted the defendant and his companion, he had a hunch that they might have been involved in the breaking and entering. He based his hunch on the time of night, the proximity to the breaking and entering, and the fit of the males to the "general description" provided by the victim. He decided "to figure out who they were and where they were coming from and possibly do [a field interrogation observation (FIO)]."[5] He rolled down the passenger's side window of the cruiser and "yelled out," "Hey guys, wait a minute." The two men made eye contact with Anjos, turned around, and jogged down a path into the park.

After the two men jogged away, Anjos remained in the police cruiser and radioed dispatch that three men[6] fitting the descriptions provided by the victim were traveling through the park toward Dale Street. Boston police Officers Christopher R.

---

[5] "A 'field interrogation observation' (FIO) has been described as an interaction in which a police officer identifies an individual and finds out that person's business for being in a particular area." Commonwealth v. Lyles, 453 Mass. 811, 813 n.6 (2009). FIOs are deemed consensual encounters because the individual approached remains free to terminate the conversation at will. See id. at 815, and cases cited.

[6] During cross-examination, Officer Anjos admitted that he observed only two males.

Carr and David Santosuosso, who had heard the original broadcast of the breaking and entering, were very near Dale Street and headed in that direction. Arriving quickly, Carr and Santosuosso observed two males matching Anjos's description walking out of the park toward Dale Street. Carr parked the cruiser on Dale Street and both officers approached the defendant and his companion as they left the park. The defendant and his companion walked with their hands out of their pockets. Carr saw no bulges in their clothing suggesting the presence of weapons or contraband.

Carr was closer to the two males, approximately fifteen yards away. When he uttered the words, "Hey fellas," the defendant turned and ran up a hill back into the park. His companion stood still. Carr ordered the defendant to stop running. After the command to stop, Carr observed the defendant clutching the right side of his pants, a motion Carr described as consistent with carrying a gun without a holster.[7]

Ignoring the command to stop, the defendant continued to run and eventually turned onto Wakullah Street. Carr lost sight

---

[7] The Commonwealth persists in claiming that the police observed the defendant clutching the right side of his pants before the command to stop. As did the Appeals Court, see Commonwealth v. Warren, 87 Mass. App. Ct. 476, 479 n.7 (2015), we reject this view of the facts where the judge explicitly found that "[t]his observation was after a verbal command to stop."

of the defendant for a few seconds before catching up with him in the rear yard of a house on Wakullah Street.  Carr drew his firearm, pointed it at the defendant, and yelled several verbal commands for the defendant to show his hands and to "get down, get down, get down."  The defendant moved slowly, conduct that Carr interpreted as an intention not to comply with his commands.  After a brief struggle, Carr arrested and searched the defendant but found no contraband on his person.  Minutes after the arrest, police recovered a Walther .22 caliber firearm inside the front yard fence of the Wakullah Street house.  When asked if he had a license to carry a firearm, the defendant replied that he did not.

Discussion.  The defendant challenges the judge's denial of the motion to suppress, claiming error in the judge's ruling that at the time of the stop on Dale Street, the police had a sufficient factual basis for reasonable suspicion that the defendant had committed the breaking and entering.[8]  In sum, he argues that the police pursued him with the intent of

_____

[8] Although the defendant argues in his brief that a stop occurred "when Officer[s] Anjos and Carr approached the defendant . . . with the intent of questioning the defendant," we assume that this was a typographical error because it is undisputed that Anjos never left his vehicle.  Rather, it was Officers Santosuosso and Carr who approached the defendant and his companion as they exited the park.  Therefore, we do not address whether the first encounter, when Anjos called out to the defendant from his cruiser, was an investigatory stop.

questioning him, while lacking any basis for doing so. Accordingly, he claims that any behavior observed during the pursuit and any contraband found thereafter must be suppressed.

1. Standard of review. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing" (citation omitted). Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). However, "[w]e review independently the application of constitutional principles to the facts found." Id. We apply these principles in deciding whether the seizure was justified by reasonable suspicion that the defendant had committed the breaking and entering on Hutchings Street. Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

2. Reasonable suspicion. The judge ruled, and the Commonwealth concedes, that the seizure occurred when Officer Carr ordered the defendant to stop running and pursued him onto Wakullah Street. If a seizure occurs, "we ask whether the stop was based on an officer's reasonable suspicion that the person was committing, had committed, or was about to commit a crime." Commonwealth v. Martin, 467 Mass. 291, 303 (2014). "That suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a

hunch." Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007), quoting Scott, 440 Mass. at 646. The essence of the reasonable suspicion inquiry is whether the police have an individualized suspicion that the person seized is the perpetrator of the suspected crime. Commonwealth v. Depina, 456 Mass. 238, 243 (2010) (stop is lawful only if "information on which the dispatch was based had sufficient indicia of reliability, and . . . the description of the suspect conveyed by the dispatch had sufficient particularity that it was reasonable for the police to suspect a person matching that description").

According to the judge's ruling, the following information established reasonable suspicion for the investigatory stop: the defendant and his companion "matched" the description of two of the three individuals being sought by the police; they were stopped in close proximity in location (one mile) and time (approximately twenty-five minutes) to the crime; they were the only persons observed on the street on a cold winter night as police canvassed the area; and they evaded contact with the police, first when both men jogged away into the park, and later when the defendant fled from Carr after being approached on the other side of the park.[9]

---

[9] The judge also cited her finding that the police observed the defendant engaging in behavior suggestive of the presence of a firearm. That finding must be discounted in the reasonable

We review the judge's findings as a whole, bearing in mind that "a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief" that a person has, is, or will commit a particular crime. Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005), cert. denied, 546 U.S. 1187 (2006), quoting Commonwealth v. Fraser, 410 Mass. 541, 545 (1991). We are not persuaded that the information available to the police at the time of the seizure was sufficiently specific to establish reasonable suspicion that the defendant was connected to the breaking and entering under investigation.

a. The description of the suspects. First, and perhaps most important, because the victim had given a very general description of the perpetrator and his accomplices, the police did not know whom they were looking for that evening, except that the suspects were three black males: two black males wearing the ubiquitous and nondescriptive "dark clothing," and one black male wearing a "red hoodie." Lacking any information about facial features, hairstyles, skin tone, height, weight, or other physical characteristics, the victim's description "contribute[d] nothing to the officers' ability to distinguish

suspicion analysis, however, as the judge explicitly found that this conduct occurred after the police commanded the defendant to stop.

the defendant from any other black male" wearing dark clothes and a "hoodie" in Roxbury. Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (insufficient detail in generalized description of suspect to justify stop where defendant was observed walking on street approximately one-half mile from scene of reported stabbing, without indication he was fleeing crime scene or had engaged in criminal activity).

With only this vague description, it was simply not possible for the police reasonably and rationally to target the defendant or any other black male wearing dark clothing as a suspect in the crime. If anything, the victim's description tended to exclude the defendant as a suspect: he was one of two men, not three; he was not wearing a red "hoodie"; and, neither he nor his companion was carrying a backpack.[10] Based solely on this description, Anjos had nothing more than a hunch that the defendant might have been involved in the crime. He acknowledged as much when he explained that the purpose of the stop was "to figure out who they were and where they were coming from and possibly do an FIO." As noted, an FIO is a consensual encounter between an individual and a police officer. Therefore, the defendant was not a "suspect" subject to the

---

[10] There is no suggestion in the judge's findings that the defendant and his companion changed clothing or jettisoned the backpack before being stopped by the police.

intrusion of a threshold inquiry. Unless the police were able to fortify the bare-bones description of the perpetrators with other facts probative of reasonable suspicion, the defendant was entitled to proceed uninhibited as he walked through the streets of Roxbury that evening.

b. Proximity. We agree with the motion judge that proximity of the stop to the time and location of the crime is a relevant factor in the reasonable suspicion analysis. Commonwealth v. Foster, 48 Mass. App. Ct. 671, 672-673, 676 (2000) (reasonable suspicion established where police observed persons matching physical description on same street and headed in same direction as indicated by informant). Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close. See Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 555 n.8 (2002), and cases cited. Here, the defendant was stopped one mile from the scene of the crime approximately twenty-five minutes after the victim's telephone call to the police. Several considerations, however, weigh against proximity as a factor supporting an individualized suspicion of the defendant as a suspect in the breaking and entering.

The location and timing of the stop were no more than random occurrences and not probative of individualized suspicion where the direction of the perpetrator's path of flight was mere

conjecture. Although the police appropriately began their investigation with the information available to them, this lack of detail made it less likely that a sighting of potential suspects could be elevated beyond the level of a hunch or speculation. As noted by the dissenting Justices in the Appeals Court opinion, given the nearly thirty-minute time period between the breaking and entering and the stop on Dale Street, the suspects could have traveled on foot within a two mile radius of the crime scene, a substantial geographic area comprising 12.57 square miles.[11] Warren, 87 Mass. App. Ct. at 499 n. 1 (Rubin, J., dissenting). See id. at 488-489 (Agnes, J., dissenting). Other than the victim's report that the perpetrators fled toward Harold Street, the responding officers had nothing more than the information in the dispatch suggesting that the perpetrators could have fled toward Seaver Street or Walnut Avenue. Depending on the direction taken, these paths of flight would lead to different Boston neighborhoods, Dorchester or Jamaica Plain, in different areas of the city.

In addition, Anjos testified to two important geographical facts that undermine the proximity factor. He acknowledged that

---

[11] Because the map of the area is part of the record, we are persuaded by the observation of a dissenting Justice in the Appeals Court opinion that the suspects could have been anywhere within twelve square miles of the crime scene by the time of the encounter with Anjos. See Warren, 87 Mass. App. Ct. at 499 n.1 (Rubin, J., dissenting).

Dale Street is in the opposite direction from where either of the reported paths of flight might lead. And, most important, Anjos also stated that if the perpetrators had headed in the direction of Dale Street, they likely would have reached that location well before his first encounter with the defendant and his companion. Thus, where the timing and location of the stop lacked a rational relationship to each other, proximity lacks force as a factor in the reasonable suspicion calculus.

c. Lack of other pedestrians. The judge considered in her analysis that the defendant and his companion were the only people observed on the street as Anjos canvassed the four to five block radius of the Hutchings Street address, traveling "up and down Harold Street, Walnut Avenue and Holworthy Street" before turning onto Martin Luther King Boulevard to return to the station.[12] This factor also is of questionable value in the analysis given the lapse of time and the narrow geographical scope of the search for suspicious persons. Anjos spoke to the victim for approximately fifteen minutes and thereafter

---

[12] One of the police officers testified during the motion to suppress hearing that another officer reported seeing a different young black male with a backpack in a nearby neighborhood. Thus, we agree with one of the dissenting Justices in the Appeals Court opinion that if the judge credited this testimony, the fact that Anjos saw no other pedestrians on the street that night was not a factor supporting reasonable suspicion that the defendant was involved in the breaking and entering. See Warren, 87 Mass. App. Ct. at 489-490 (Agnes, J., dissenting).

canvassed only four to five blocks surrounding the location of the breaking and entering.  The lapse of time between the victim's report and the canvassing suggests that the perpetrators could have fled the immediate area before Anjos began his search.  Thus, the defendant's presence on the street, some distance away from the crime, within a time frame inconsistent with having recently fled the scene, is hardly revelatory of an individualized suspicion of the defendant as the perpetrator of the crime.

d.  Flight.  We recognize that the defendant's evasive conduct during his successive encounters with police is a factor properly considered in the reasonable suspicion analysis. Commonwealth v. Stoute, 422 Mass. 782, 791 (1996) (failure to stop combined with accelerated pace contributed to officer's reasonable suspicion).  But evasive conduct in the absence of any other information tending toward an individualized suspicion that the defendant was involved in the crime is insufficient to support reasonable suspicion.  Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) ("Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support . . . reasonable suspicion"); Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981) (quick maneuver to avoid contact with police insufficient to establish reasonable suspicion).  "Were the rule otherwise, the police could turn a

hunch into a reasonable suspicion by inducing the [flight] justifying the suspicion." Stoute, supra at 789, quoting Thibeau, supra. Although flight is relevant to the reasonable suspicion analysis in appropriate circumstances, we add two cautionary notes regarding the weight to be given this factor.

First, we perceive a factual irony in the consideration of flight as a factor in the reasonable suspicion calculus. Unless reasonable suspicion for a threshold inquiry already exists, our law guards a person's freedom to speak or not to speak to a police officer. A person also may choose to walk away, avoiding altogether any contact with police. Commonwealth v. Barros, 435 Mass. 171, 178 (2001) (breaking eye contact and refusing to answer officer's initial questions did not provide reasonable suspicion for detention or seizure as "[i]t was the defendant's right to ignore the officer"). Yet, because flight is viewed as inculpatory, we have endorsed it as a factor in the reasonable suspicion analysis. See Commonwealth v. Sykes, 449 Mass. 308, 315 (2007) (defendant's abandonment of bicycle in "effort to dodge further contact with the police was significant" in determining reasonable suspicion); Commonwealth v. Grandison, 433 Mass. 135, 139-140 (2001) (attempt to avoid contact with police may be considered with other factors in establishing reasonable suspicion). Where a suspect is under no obligation to respond to a police officer's inquiry, we are of

the view that flight to avoid that contact should be given little, if any, weight as a factor probative of reasonable suspicion. Otherwise, our long-standing jurisprudence establishing the boundary between consensual and obligatory police encounters will be seriously undermined. Thus, in the circumstances of this case, the flight from Anjos during the initial encounter added nothing to the reasonable suspicion calculus.

Second, as set out by one of the dissenting Justices in the Appeals court opinion, where the suspect is a black male stopped by the police on the streets of Boston, the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from the findings in a recent Boston Police Department (department) report documenting a pattern of racial profiling of black males in the city of Boston. Warren, 87 Mass. App. Ct. at 495 n.18 (Agnes. J., dissenting), citing Boston Police Commissioner Announces Field Interrogation and Observation (FIO) Study Results, http://bpdnews.com/news/2014/10/8/boston-police-commissioner-announces-field-interrogation-and-observation-fio-study-results [https://perma.cc/H9RJ-RHNB].[13] According to the

---

[13] See also Warren, 87 Mass. App. Ct. at 495 n.18 (Agnes, J., dissenting), citing American Civil Liberties Union, Stop and Frisk Report Summary, https://www.aclum.org/sites/all/files/images/education/stopandfrisk/stop_and_frisk_summary.pdf [https://perma.cc/7APK-8MG9] ("[sixty-three per cent] of Boston

study, based on FIO data collected by the department,[14] black men in the city of Boston were more likely to be targeted for police-civilian encounters such as stops, frisks, searches, observations, and interrogations.[15]  Black men were also disproportionally targeted for repeat police encounters.[16]  We do not eliminate flight as a factor in the reasonable suspicion analysis whenever a black male is the subject of an investigatory stop.  However, in such circumstances, flight is not necessarily probative of a suspect's state of mind or

police-civilian encounters from 2007-2010 targeted blacks, even though blacks made up less than [twenty-five per cent] of the city's population").

[14] The study by the Boston Police Department (department) reviewed all field interrogation and observation (FIO) reports, approximately 205,000 in total, submitted by Boston police officers from 2007 through 2010.  Warren, 87 Mass. App. Ct. at 495 n.18 (Agnes, J., dissenting).

[15] "[T]he targets of FIO reports were disproportionately male, young, and Black.  For those 204,739 FIO reports, the subjects were 89.0 percent male, 54.7 percent ages 24 or younger, and 63.3 percent Black."  Final Report, An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports, at 2 (June 15, 2015).

[16] The department's study revealed that five per cent of the individuals repeatedly stopped or observed accounted for more than forty per cent of the total interrogations and observations conducted by the police department.  Warren, 87 Mass. App. Ct. at 495 n.18 (Agnes, J., dissenting), quoting Boston Police Commissioner Announces Field Interrogation and Observation (FIO) Study Results, http://bpdnews.com/news/2014/ 10/8/boston-police-commissioner-announces-field-interrogation- and-observation-fio-study-results [https://perma.cc/H9RJ-RHNB].

consciousness of guilt. Rather, the finding that black males in Boston are disproportionately and repeatedly targeted for FIO encounters suggests a reason for flight totally unrelated to consciousness of guilt. Such an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity. Given this reality for black males in the city of Boston, a judge should, in appropriate cases, consider the report's findings in weighing flight as a factor in the reasonable suspicion calculus.

Here, we conclude that the police had far too little information to support an individualized suspicion that the defendant had committed the breaking and entering. As noted, the police were handicapped from the start with only a vague description of the perpetrators. Until the point when Carr seized the defendant, the investigation failed to transform the defendant from a random black male in dark clothing traveling the streets of Roxbury on a cold December night into a suspect in the crime of breaking and entering. Viewing the relevant factors in totality, we cannot say that the whole is greater than the sum of its parts.

Conclusion. For the reasons stated above, the police lacked reasonable suspicion for the investigatory stop of the defendant. Therefore, we vacate the judgment of conviction and

remand the matter to the Boston Municipal Court for further proceedings consistent with this opinion.

So ordered.