NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-748

COMMONWEALTH

vs.

NATHAN RUSSELL.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant was arrested after he was observed by officers as he walked and ran through a residential neighborhood, jumped a fence, and concealed a firearm in some children's toys. A judge of the Superior Court denied the defendant's motion to suppress evidence of the firearm. A single justice of the Supreme Judicial Court permitted this interlocutory appeal, which was transferred to the Appeals Court. We affirm.

Background. We recite facts found by the motion judge after hearing, supplemented by uncontested evidence from the record of the suppression hearing, reserving certain facts for later discussion. See Commonwealth v. Depina, 456 Mass. 238,

239-240 (2010).  One witness, Officer John Denio, a seven-year officer with the Worcester police department who was assigned to the gang unit at the time, testified at the suppression hearing; the motion judge credited his testimony in its entirety.

This matter arose because the Worcester police were on the trail of a shooting suspect who had failed to stop for police and then fled from a car.  A description of the suspect was broadcast and Denio, who was "in the area," heard it.  The officer was familiar with the area from (among other things) "shootings, violent crimes, armed robberies, drug activity, gang activity" and had been involved in firearms and drug arrests in the area, which was "a high-crime area."  He went to assist in the search, driving in "the direction of travel" in which the suspect had fled.

An officer-to-officers broadcast, memorialized on a "turret tape" and introduced in evidence at the suppression hearing, captured the back-and-forth among officers beginning after Denio first saw the defendant.  Denio described the defendant as "wearing all black" and described his location.  In the seconds that followed, while Denio was following the defendant, other officers described the shooting suspect as barefoot, wearing all black, with a black sweatshirt and dreadlocks.

Denio stopped his unmarked cruiser at Catharine Street and Eastern Avenue where he saw two men walking along the street. Both men were wearing all black and had their hoods on. Denio perceived the defendant's appearance as similar to the broadcast description of the shooting suspect. The men ran up a driveway, resulting in people outside "seem[ing] alarmed." Having lost sight of the men, Denio drove around the corner onto Vinson Street.

Denio saw the men in a wooded area behind houses on Eastern Avenue, "frantically standing in front of each other kind of pacing." Denio had not yet turned on any lights or sirens. After hearing someone yell, "Get off my property," Denio broadcast his observations over the police radio. Two uniformed officers arrived on Vinson Street in separate marked police cruisers; neither had lights or sirens on. The three officers moved into the wooded area, in a "zig-zagging" path and watched the men. None of the officers drew guns or asked the men to stop. Denio's intention was "to observe" the defendant and then "to go and talk to" him because Denio "wasn't sure if one of [the men] was" the shooting suspect.

The defendant and his companion began to run through the wooded area toward 6 Blodgett Place, a residential building surrounded by a chain-link fence. On arriving at the fence, the

3

men "hopped" it and approached the door of 6 Blodgett Place. As he emerged from the trees, Denio saw the men "huddled kind of facing" some children's toys on the ground next to a shed outside the residence, "almost kind of like they were rummaging towards it." Based on his training and experience, Denio believed the men were trying to discard something.

After the defendant's interaction with the toys, and just before the officers arrived at the yard, a resident emerged from the home and confronted the defendant. The confrontation can be seen on security footage, entered as an exhibit at the suppression hearing, which the panel reviewed. Immediately afterward the officers entered the yard and ordered the men to the ground. Denio testified that when the defendant turned to face them, Denio "immediately" recognized him from "prior police investigations" and from the defendant's involvement in a street gang. Denio had seen a social media post of the defendant "in the backseat of a vehicle with a firearm in his hand." Before the defendant and his companion were seen near the children's toys, no officer had drawn a weapon, turned on lights or sirens, or made a "command[] to stop or anything of [that] sort." Officers found a loaded handgun in the area by the children's toys.

Discussion. "'In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error,' and we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing." Commonwealth v. Hoose, 467 Mass. 395, 399 (2014), quoting Commonwealth v. Contos, 435 Mass. 19, 32 (2001). "[F]indings drawn partly or wholly from testimonial evidence are accorded deference and not set aside unless clearly erroneous," while "an appellate court may independently review documentary evidence, and . . . lower court findings drawn from such evidence are not entitled to deference" (footnotes omitted). Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018). "We conduct an independent review of the judge's application of constitutional principles to the facts found." Hoose, supra at 400.

"An investigatory stop or 'seizure' by police is justified under art. 14 if police have reasonable suspicion at the time of the stop to conduct it." Commonwealth v. Matta, 483 Mass. 357, 360 (2019). "Thus, we must determine (1) at what point the stop occurred; and (2) whether the officer had reasonable suspicion for the stop at that time." Id.

In determining when the stop occurred, we are mindful that "[w]hether an encounter between a law enforcement official and a

5

member of the public constitutes a noncoercive inquiry or a constitutional seizure depends upon the facts of the particular case," and that "the coercion must be objectively communicated through the officer's words and actions for there to be a seizure." Matta, 483 Mass. at 363-364.

> "[R]ather than focusing primarily on whether a reasonable person would have believed that he or she was free to leave, we look at the totality of the circumstances to determine whether a member of law enforcement has 'engaged in some show of authority' that a reasonable person would consider coercive; that is, behavior 'which could be expected to command compliance, beyond simply identifying [him- or herself] as police.'"

Id. at 362, citing Commonwealth v. Sanchez, 403 Mass. 640, 644 (1988).

Our analysis is governed by the principle that "a person is seized, for the purposes of art. 14, when a police officer initiates a pursuit with the obvious intent of requiring the person to submit to questioning." Commonwealth v. Stoute, 422 Mass. 782, 783 (1996).

> "Framed slightly differently, a pursuit, which, objectively considered, indicates to a person that he would not be free to leave the area (or to remain there) without first responding to a police officer's inquiry, is the functional equivalent of a seizure, in the sense that the person being pursued is plainly the object of an official assertion of authority, which does not intend to be denied, and which infringes considerably on the person's freedom of action."

Id. at 789.

6

The defendant maintains that he and his companion were "seized" in the art. 14 sense when they jumped the fence behind the residence.  We disagree.  Although a pursuit can be a seizure for art. 14 purposes, Stoute, 422 Mass. at 789, the analysis is fact specific.  Commonwealth v. Franklin, 456 Mass. 818, 822 (2010).  The facts as found by the motion judge, and unchanged by our review of the surveillance videos and the turret tape, are that the police did not assert their authority in any of the usual ways (e.g., lights, sirens, brandishing firearms), nor did they call out to the defendant or his companion before they encountered the men behind the home.  See Commonwealth v. Pimentel, 27 Mass. App. Ct. 557, 560 (1989).  While the officers followed the defendant through a wooded area, their having left their cruisers to follow on foot does not require a finding that they were running after him, nor that they caused him to run,[1] nor that the officers intended to force the defendant to submit to their authority.  "Following or

---

[1] The motion judge made no explicit findings about the pace at which the three officers followed the defendant.  Although the defendant contended, before oral argument, that the time stamps on the turret tape might be used to establish a timeline, following oral argument, the defendant clarified that "it was possible that the tape was abridged," and that the record was not clear on that point.  The motion judge made no findings regarding the time stamps on the turret tape and, in light of this ambiguous factual record, we will not draw any conclusions on this point.

observing someone without more, such as using a siren or lights, attempting to block or control an individual's path, direction, or speed, or commanding the individual to halt, is not pursuit." Commonwealth v. Watson, 430 Mass. 725, 731 (2000), citing Commonwealth v. Williams, 422 Mass. 111, 116-117 (1996). "[F]ollowing a person, presumably at a rate of speed sufficient to keep him in sight, does not amount to a seizure absent some additional assertion of authority, by direct verbal communication ('stop') or otherwise (blocking, use of flashers)." Franklin, 456 Mass. at 822. See Commonwealth v. Gunther G., 45 Mass. App. Ct. 116, 117-118 (1998). These additional factors were not present here. We conclude, as did the motion judge, that the defendant was stopped or "seized" for art. 14 purposes when he was ordered to the ground behind 6 Blodgett Place.

Assuming without deciding that the stop or seizure of the defendant resulted in the police finding the firearm, we next ask whether the seizure was supported by reasonable suspicion. "Reasonable suspicion exists when an officer, based on specific, articulable facts and reasonable inferences therefrom, in light of the officer's experience, has reasonable grounds to suspect a person is committing, has committed, or is about to commit a crime" (quotation and citation omitted). Commonwealth v.

8

Resende, 94 Mass. App. Ct. 194, 197 (2018). "We view the facts and circumstances as a whole in assessing the reasonableness of the officers' conduct." Williams, 422 Mass. at 116. "Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry." Watson, 430 Mass. at 729.

We conclude that the stop of the defendant was supported by reasonable suspicion. The arresting officers were part of a manhunt for a suspected shooter who had fled from a car in the area. Denio perceived the defendant's appearance as consistent with what he recalled of the description broadcast of the shooting suspect.[2] The defendant -- perhaps upon seeing Denio, though the record is unclear -- suddenly retreated to private property, alarming the neighbors. When Denio circled the block so he could see the defendant again, the defendant took off

_____

[2] At the hearing, Denio agreed that neither the defendant nor his codefendant had dreadlocks, was Black, or was shoeless -- all parts of the descriptions of the shooting suspect -- and that the broadcast described one man, not two. He explained that, in the circumstances, he may have missed the full description because he was focusing on the search. As noted above, the motion judge, who had the opportunity to observe and question Denio, credited his testimony in full. We disturb such a finding only if clearly erroneous. See Tremblay, 480 Mass. at 655. This is not such a situation. Relatedly, the defendant maintains that, even if Denio did not register the full description of the shooting suspect, an "objectively reasonable officer in his position" would have taken the full description into account. We decline to speculate about this; the fact is that Denio recalled only some portion of the description.

9

through a wooded area.  As the officers followed, they did not display force by showing firearms, calling to the defendant, or using lights and sirens.  Despite the absence of a display of force, the defendant crossed private property and leapt over a fence into a stranger's yard, visibly alarming the property's resident, then rummaged around in some children's toys in a manner that Denio concluded looked like an attempt to hide something.  See Franklin, 456 Mass. at 823 (reasonable suspicion where police observed defendant toss something over fence as he ran and police heard metallic sound when object hit ground); Commonwealth v. Shane S., 92 Mass. App. Ct. 314, 322-323 (2017) (reasonable suspicion where police observed defendant stop and bend down near two grills while running; firearm later discovered by grills).  These facts, taken together, provided reasonable suspicion to stop the defendant.

Relying on Commonwealth v. Warren, 475 Mass. 530 (2016), the defendant maintains that the police lacked reasonable suspicion based on the description of the suspect.  We are not persuaded.  While here, as in Warren, supra at 535-536, the description of the suspect (as recalled by Denio) was vague enough to have encompassed multiple suspects,[3] this defendant was

---

[3] Because the defendant is a white man, while the shooting suspect was Black, the racial profiling concerns raised in

10

spotted close in both place and time to the broadcast description of the suspect. "Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close." Id. at 536. Here, contra to Warren, the defendant's position was consistent with the suspect's reported flight path and with the timing of his discovery by Denio. Contrast id. at 537. And while "evasive conduct in the absence of any other information tending toward an individualized suspicion that the defendant was involved in the crime is insufficient to support reasonable suspicion," id. at 538, "the defendant's evasive conduct during his successive encounters with the police is a factor properly considered in the reasonable suspicion analysis" (citation omitted). Id. Finally, and crucially, unlike in Warren, the officers here were privy to neighbors' reactions to the defendant as he and his companion retreated to private property. The officers saw the defendant jump a fence in an apparent effort to avoid them. Before stopping the defendant, officers saw him appearing to

---

Warren are not central to our analysis. See Warren, 475 Mass. at 539-540.

11

conceal something from view in some children's toys as they approached him in a private yard.  This was enough.

Order denying motion to
 suppress affirmed.

By the Court (Neyman,
 Hershfang & Hodgens, JJ.[4]),

Assistant Clerk

Entered:  June 11, 2024.

---

[4] The panelists are listed in order of seniority.