NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-228

COMMONWEALTH

vs.

SIDNEY PIRES FONSECA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant pleaded guilty, conditionally, to one count of carrying an unlicensed firearm, G. L. c. 269, § 10 (a), one count of possessing a large capacity feeding device, G. L. c. 269, § 10 (m), and one count of possessing ammunition without a firearm identification card, G. L. c. 269, § 10 (h) (1).  The conditional guilty plea reserved the defendant's right to appeal from an order of a judge of the Superior Court denying his motion to suppress evidence recovered from a warrantless seizure and subsequent search of his person.  See Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019); Commonwealth v. Gomez, 480 Mass. 240, 241 (2018).

Before us, the defendant challenges only his seizure.[1]  We accept the facts as found by the motion judge, absent clear error, as supplemented with uncontradicted witness testimony, which the judge explicitly or implicitly credited.  Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

Facts.  On November 30, 2021, Sergeant Andrew Simmons was assigned to conduct street level enforcement in New Bedford near the Bay Village housing development.  It was an area near which the "South End Gang" operated.  A rival gang, the "West End Gang," operated near another housing development formally known as "Temple Landing," which is widely referred to by its former name, the "United Front."

In the weeks prior to the seizure at issue here, both areas had seen an uptick in shootings.  On the afternoon in question, Sergeant Simmons was conducting street level enforcement near Bay Village.  As he explained, although he was in an "undercover" vehicle, "most people know that they're cruisers" and their occupants' status as police officers, he testified, is probably just as "obvious."

Around 1 P.M., Sergeant Simmons observed two dark skinned young men he didn't know, who turned out to be the defendant and

_____

[1] Although we express no opinion with respect, therefore, to the subsequent patfrisk of the defendant, we do note that additional evidence supporting that patfrisk developed during a chase prior to the patfrisk but after the defendant was seized.

a juvenile.  The two were "just walking" on the east side of Purchase Street, heading south from Wing Street.  The sergeant saw them enter the backyard of 340 Purchase Street, an abandoned and boarded-up house.  In the past, the police had done searches in the area of the yard on unrelated cases.  In addition, the police had previously found three "block guns," guns stored in hidden locations where they could be accessed by more than one person, in the Bay Village area.

The two young people stayed in the backyard at 340 Purchase Street, behind the abandoned house, for "a couple of minutes," then emerged the same way they had gone in, exiting the property onto Purchase Street, after which they walked north on Purchase Street back the way they came, toward Wing Street.  The sergeant could see their hands, which appeared empty, and saw nothing suspicious in how they were walking.  Nonetheless, he decided to keep an eye on them, following behind them in his car, not "super slow, but fairly slow."  At one point, he came within fifteen to twenty feet of them.

The two individuals turned east onto Wing Street.  They looked back at the sergeant's location several times, and after they noticed his car, they began running east.  He saw them run east across Acushnet Avenue before running south into the courtyard area of the Bay Village housing development, where the car could not follow.  He saw them pop in and out between the

3

buildings of the development.  They appeared to be on their cell phones, looking around and peering around one of the buildings.

In response to a request by Sergeant Simmons that included a description of the two individuals' clothing, Sergeant Jarrod Gracia drove east on Wing Street past the housing development looking between its buildings.  He saw two "younger looking" males matching the clothing descriptions given by Sergeant Simmons, who said one was wearing light-colored clothing and the other dark, pacing around frantically.  From his vantage point, he was unable to recognize these individuals.  They seemed to be talking to each other.  He could not tell whether they were on their cell phones, though he saw nothing in their hands.[2] Sergeant Gracia lost sight of them.

Sergeant Simmons then went to check the yard he had seen the two enter earlier.  However, as soon as he returned to 340 Purchase Street, he saw the pair once again leaving the backyard behind the abandoned house.  Based on his knowledge of the area, he concluded that they would have had to climb over a fence at the property's rear to return to the backyard without his seeing

---

[2] The motion judge made a finding that "the pair were in the development and talking frantically on their phones."  To the extent that this is a description of what Sergeant Gracia claimed to have seen, it is inaccurate, as he did not report this behavior.  We need not, however, determine whether the judge's finding is clearly erroneous or adequately supported because our decision does not depend upon it and would be the same with or without this finding.

them.  When they exited the yard, they appeared to be looking around and walking hurriedly.

Sergeant Simmons noticed that both of their hands were in their pockets this time, unlike before.  The juvenile had one hand in his jacket pocket, with the other across his body around the pocket, as if he were clutching something against his body.  The defendant, by contrast, had both his hands in the front "kangaroo pouch pocket" of his hooded sweatshirt located near his waistband.  Sergeant Simmons testified that it looked as if the defendant was holding something in his hands against his waist, in that instead of hanging down relaxed, creating pressure on the outside of his pocket, his hands seemed to direct pressure inwards, as though they were not relaxed in the sweatshirt.  He testified, however, that he could not tell how much pressure they were applying or what they were holding, and, given that it was late November, he acknowledged, "I guess he could just be keeping his hands warm."

Having seen this, Sergeant Simmons radioed his colleagues and asked them to stop the two individuals.  Within seconds, an unmarked police cruiser, driven by a third sergeant, Stephen Gwozdz, pulled up behind them, and his partner, Detective

Nathaniel Almeida, got out of the front passenger seat.[3]  The two individuals started running.  Detective Almeida ran after them.

The motion judge concluded that the seizure occurred when Detective Almeida began chasing the defendant and upheld it on the ground that there was reasonable suspicion the defendant unlawfully possessed a firearm, either individually or as a joint venturer.  See Commonwealth v. Britt, 465 Mass. 87, 100-101 (2013), quoting Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009).

Discussion.  Under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, individuals are protected from unreasonable seizures at the hands of the government.  A seizure, in a constitutional sense, occurs when "an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay." Commonwealth v. Matta, 483 Mass. 357, 362 (2019).  The Commonwealth bears the burden of demonstrating that the police officers acted lawfully in seizing the defendant.  Commonwealth v. Williams, 422 Mass. 111, 115-116 (1996).

---

[3] There were some findings about Almeida recognizing the individuals and about some knowledge of their previous conduct, but it is irrelevant to our decision.

6

The test for reasonableness in this context is well known. The officers must have had reasonable suspicion, based upon articulable facts, that the individual, in this case the defendant, "has committed, is committing, or is about to commit a crime." Commonwealth v. DeJesus, 72 Mass. App. Ct. 117, 119 (2008).

In this case, the parties correctly agree that the defendant was seized when Detective Almeida got out of his cruiser and began to chase him and the juvenile. See Commonwealth v. Ware, 76 Mass. App. Ct. 53, 56 (2009). The question, then, is whether at that point there was reasonable suspicion, based on articulable facts, that the defendant had committed, was committing, or was about to commit a crime.

As described briefly above, these events took place in a high crime area. Given how many of our urban areas in the Commonwealth fall into the "high crime area" category, and the large number of innocent people who live in those areas, ordinarily this factor is worth little weight in the reasonable suspicion calculus. Commonwealth v. Meneus, 476 Mass. 231, 238 (2017). We do have cases, however, holding that where crime has been particularly intense in a high crime area in the recent past, that can add more weight to this factor. See Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007); Commonwealth v. Fisher, 54 Mass. App. Ct. 41, 43, 45 (2002).

7

In this case, there was no immediately recent criminal conduct in the area comparable to the case in Fisher, where police had within thirty minutes of the challenged patfrisk responded to a gun-related call on the same block where they eventually encountered the defendant. On the other hand, there had been a shooting as recently as nine days prior to this, so this factor can be given some additional weight compared to the run-of-the-mill case.

In addition, the Commonwealth points out that the defendant and the juvenile ran when they saw the police. Again, however, we have been cautioned that merely running from the police, particularly if one is a person of color, is of very little value, if any, in determining whether an individual has engaged in crime. Commonwealth v. Warren, 475 Mass. 530, 538-540 (2016). The Warren case indicates that in the City of Boston, it should be given little weight in light of the fact that "black males in Boston are disproportionately and repeatedly targeted for" police encounters. Id. at 540. This took place in New Bedford, not Boston, but for most of the reasons articulated in Warren, we think, standing alone, this is a factor that would be worth minimal weight. Nonetheless, all the facts and circumstances have to be considered together, and, in this case, immediately after running from the police, the defendant and the juvenile did not continue to attempt to avoid

8

them.  Rather, they almost immediately ran back, not on the street but by a route that was not observable from the street, to the very backyard from which they had initially been seen emerging, a location that one might reasonably expect the police immediately to return to as well, in order to see whether any evidence, of crime or otherwise, could be found there explaining the individuals' brief visit.

Sergeant Simmons saw the individuals again emerge from the backyard as he returned to the abandoned house, so whatever their purpose in going there, it took only a brief, few moments. Therefore, they were not returning there to hide or to engage in any other kind of conduct that might take any amount of time.

It is reasonable to suspect that they returned there to retrieve something they had left and, given the surreptitious route of their return, it was reasonable to suspect that that "something" was contraband of some kind.  Given that their avoidance of the police was temporary, this also strengthens somewhat the inference that they were running from the police not out of caution or fear but to avoid being apprehended for a crime.

As they emerged from the yard, the juvenile had one hand in his jacket pocket and the other hand reaching across his body and holding the outside of the pocket.  It was reasonable to suspect that what he was holding was the contraband, and

9

likewise, given the awkwardness of the position, and his use of two hands, that it was something heavy, perhaps a firearm. Because lawful owners of firearms ordinarily do not store them in backyards behind vacant houses, there was reasonable suspicion that any firearm possessed by the juvenile was unlawfully possessed, even if the officers could not tell that the juvenile was under eighteen.

The question, though, is whether there was reasonable suspicion that the defendant, not the juvenile, had committed or was committing a crime. The Commonwealth would rely on the placement of the defendant's hands in the front pockets of his hoodie to show suspicion that he himself possessed a second firearm. The hands-in-the-hoodie-pocket presents a trickier question. It is not clear that the testimony of the sergeant indicated that his conclusion about what the defendant might be doing or holding in his hoodie pocket was based on his training and experience or was merely an inference he drew. But even if it were the former, we would be loath to conclude that having one's hands in one's hoodie pocket on a November afternoon, whether they were resting, pressing the pocket outward, or otherwise, creates reasonable suspicion that one is holding a firearm in that pocket. Far too many people wear hoodies and put their hands in their pockets in innumerable innocent

situations for it to be reasonable to suspect, without more specific evidence, that the defendant was holding a firearm.

In any event, we think, ultimately, we need not rely on the placement of the defendant's own hands because, even without the evidence of how the defendant's hands were in his hoodie, there was reasonable suspicion that the defendant was a joint venturer with the juvenile in the possession of a firearm the police reasonably suspected was in the juvenile's pocket. That is enough to justify the seizure.

The defendant argues that there was insufficient evidence to support a reasonable suspicion that the defendant was in joint possession of the firearm. And that may be true. But

> "'[t]he theory of "joint venture" liability finds its roots in the concept of accessorial or accomplice liability.' Thus, in order to establish liability for firearm possession under a theory of joint venture, it is not necessary that the Commonwealth prove that a defendant had actual or constructive possession of a firearm, but only that such a defendant 'was accessory to another identified defendant in possessing a firearm.'"

Commonwealth v. Humphries, 465 Mass. 762, 767-768 (2013) (citations omitted).

The facts known to the police at the time were sufficient to support a reasonable suspicion that the defendant had aided the juvenile in gaining possession of the firearm. The police could reasonably have thought that the defendant had joined the juvenile, and that together they had left the firearm in the

11

backyard, and that he then returned with the juvenile to the backyard in order to assist him in retrieving it.

Of course, there need not be proof beyond a reasonable doubt, or even a showing by a preponderance of the evidence, that the defendant aided the juvenile, but only reasonable suspicion.  See Commonwealth v. Francis, 104 Mass. App. Ct. 593, 602 (2024) ("Evidence establishing joint venture [for firearm possession] may include proof that the defendant 'agree[d] to . . . provide aid or assistance in committing the crime, or in escaping, if such help [became] necessary'" [citation omitted]).  Consequently, the order denying the motion to suppress is affirmed.

Order denying motion to
    suppress affirmed.

By the Court (Rubin, Shin &
    Hodgens, JJ[4]),

Clerk

Entered:  May 22, 2025.

---

[4] The panelists are listed in order of seniority.